**Frederick M. MARINE, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Oral Argument before a Panel of the Court: June 19, 1990.

Oral Argument before the Court En Banc: Oct. 3, 1990.

Rehearing before the Court En Banc following Supplemental Briefing: Oct. 29, 1991.

Decided: May 15, 1992.

---

Bernard J. O'Donnell (argued), Brian J. Bartley and Duane D. Werb, Asst. Public Defenders, Wilmington, for appellant.

Richard E. Fairbanks, Jr., Chief of Appeals Div. (argued), Dept. of Justice, Wilmington, for appellee.

Before HORSEY, MOORE, WALSH, and HOLLAND, JJ., and ALLEN, Chancellor,[1] constituting the Court en Banc.

HORSEY, Justice:

Defendant, Frederick M. Marine, was charged at the age of fourteen with murder in the second degree in the death of Amanda Hemphill, who was ten years old at the time of her death. Marine was later indicted by a grand jury for murder in the first degree. Following a reverse amenability hearing,[2] he was prosecuted as an adult in Superior Court and found guilty by a jury of murder in the second degree, and convicted and sentenced to life imprisonment. In his appeal, Marine raises four claims of error:

(1) That his incriminating oral statement made at his home during police questioning about his involvement in Amanda's death and his later taped confession at the police station were taken in violation of his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and therefore erroneously admitted at trial;

(2) That Superior Court was without jurisdiction under 10 *Del.C.* § 921(2) to sentence him to the lesser included offense of murder in the second degree;

(3) That to otherwise construe the Delaware statutory scheme would deny him equal protection of the law by treating him differently from another juvenile guilty of the same conduct who, if originally charged with murder in the second degree, would be subject to Family Court's exclusive jurisdiction; and

(4) That Superior Court committed legal error in the reverse amenability proceeding, 10 *Del.C.* § 939(b).

We hold: (1) that Marine's Fifth Amendment rights under *Miranda* were not violated, either in the police questioning of him in his home, or in his later confession at the police station; (2) that the Delaware statutory scheme, 10 *Del.C.* § 921(2)a and b, confers jurisdiction on Superior Court to convict and sentence a juvenile such as Marine as an adult for any lesser included crime of murder in the first degree to which he may be found guilty; and (3) that the Delaware statutory scheme so construed does not deny Marine the equal protection of the laws. However, we conclude that Superior Court committed legal error in its consideration of the statutory factors relative to Marine's reverse amenability application under 10 *Del.C.* § 939(b). Therefore, we remand this case for a new reverse amenability hearing.

## FACTS

On Saturday, November 21, 1987, about 8:00 a.m., the Smyrna, Delaware, police found Amanda Hemphill's body in a local creek bed. The previous afternoon, Amanda had visited with girlfriends at the home of a classmate in an adjacent residential neighborhood. When Amanda failed to return home before dark for dinner, her mother called the Smyrna police to report her daughter missing. Due to weather conditions and darkness, the police were unable to locate Amanda's body until the next morning.

Amanda's body was found lying face down in shallow water in Providence Creek, a short distance from her home, and approximately 300 feet from where she had parted company with one of her girlfriends to walk the remaining distance home alone. She had been beaten about the face and head and had bruises on her upper body. Under her body was found a seven foot steel grate. In the vicinity, the police dis-

---

1. Sitting pursuant to Supreme Court Rules 2(a) and (b) and 4(a) and (d) and Article IV, § 12 of the Delaware Constitution, to fill up the Court en Banc.

2. Pursuant to 10 *Del. C.* § 939(b), a juvenile defendant within the original jurisdiction of the Superior Court may apply for a transfer to Family Court for trial and disposition. Superior Court is then required to make a "reverse amenability determination." *State v. Anderson*, Del.Super., 385 A.2d 738, 740 (1978).

covered what they described as a yellow "cool" shirt. An autopsy completed the following day found the cause of death to have been strangulation from a choke hold, neither manual nor ligature.

With little evidence and no suspects, the Smyrna Police brought in detectives of the Delaware State Police to lead the investigation. Later that day, State Detective Richard A. Ashley and Smyrna Police Detective William Wilson, surveyed the nearby residential areas, going from house to house seeking information and leads. The police learned that a young people's party had been held the previous evening at the home of Margaret and Bruce Leister. At the Leister home, the police spoke to Lisa Marine, Mrs. Leister's sixteen-year-old daughter. Lisa stated that Amanda Hemphill had not been at the party. The police then asked whether Lisa had seen anyone near the creek the previous day, and she stated that her brother Frederick Marine had been playing near the creek, which ran behind their house. Lisa also stated that she had noticed that her brother was wet and muddy when he returned home, and when she asked him what happened, he told her he had fallen into the creek while trying to catch a turtle. When the police asked if they could speak with her brother, Lisa informed them that he and their parents were away for the weekend on a camping trip and would return the following evening. The police asked Lisa to have her parents call them when they returned home.

Over the weekend, Detectives Ashley and Wilson continued their investigation. The detectives also contacted Smyrna Middle School for background information on both Frederick Marine and another student. Ashley and Wilson learned that Marine had attended special education classes in junior high school and that Marine was considered to be a problem child in eighth grade.

Sunday evening, about 8:00 p.m., Detectives Ashley and Wilson went to defendant's home after receiving a phone call that the family had returned home. By the time the police arrived, Mrs. Leister had been informed by her neighbors of Amanda Hemphill's death and she understood why the police were there. Mrs. Leister, or her nineteen-year-old son John Marine, invited the police to come in.

The Leisters were cooperative. The detectives assured them that their reason for wishing to question Mrs. Leister's son Frederick was that the victim had been found in the creek that ran behind their house. They assured everyone present, including defendant, that he was not a suspect—they simply wanted to know where he had been the previous Friday afternoon and whether he had seen anything unusual in the vicinity of the creek. The questioning of defendant began in the presence of his parents, brother and sister.

Defendant initially denied having been in the creek the previous Friday afternoon. Defendant stated that he had been in his backyard building a fort. The police then asked defendant's mother whether defendant owned a yellow "cool" shirt. Defendant's mother stated that he did, and she proceeded into defendant's bedroom to look for the shirt, with defendant and the detectives following.

Detective Ashley asked defendant what shoes he had worn when he was playing Friday afternoon. Defendant stated that he owned two pairs of shoes, both of which he pointed to near his bed. Detective Ashley noticed, at the foot of defendant's bed, a third pair of shoes, which appeared to be muddy and damp. Defendant immediately acknowledged them also to be his shoes. He then handed over the shoes, stating that he had worn them in the creek the previous week. Detective Ashley pointed out that the shoes appeared still to be damp and muddy.

Defendant also initially denied knowing the victim, whereupon his brother, John Marine, realizing that in fact Fred knew Amanda, told defendant to tell the truth. Detective Ashley then recounted to defendant his sister Lisa's statement the previous evening—that she had seen him coming from the direction of the creek on Friday afternoon. Defendant then admitted that he had been in the creek that afternoon,

but denied having seen Amanda. He reiterated that he had been building a fort. Defendant's mother heatedly told her son to tell the truth and to tell the detective whatever he knew.

Detective Ashley then took defendant's stepfather aside. Ashley told Mr. Leister that he thought Fred was hiding something and that he thought Fred might know who had murdered Amanda Hemphill. Detective Ashley returned to defendant's bedroom and told him that he seemed to be hiding something and that he wasn't being completely truthful. Defendant began to cry. He then stated that he had seen a man with a gun running from the creek, but continued to deny having seen Amanda.

Detective Ashley then told defendant that something just didn't add up; that it "could have been an accident." Defendant's mother told defendant, "If you did something to the little girl and it was an accident, just say so." Defendant again began to cry. He asked everyone to leave his room except Ashley. Wilson also remained in the room, at Ashley's request. Ashley then put his arm around defendant. John Marine later testified that he overheard Detective Ashley assure defendant that Ashley was defendant's friend. John Marine further recalled the detective stating to defendant that nobody in the neighborhood liked defendant and that his neighbors thought that he had killed Amanda. Detective Ashley denied making any such statements. Defendant then confessed to Detective Ashley that he had killed Amanda, but that it had been an accident. Defendant explained that he had been playing with a steel grate in the creek and when Amanda came near it, the grate fell and accidentally hit Amanda in the head, knocking her down. When defendant couldn't pick her up, he became scared and ran.

Detective Ashley then called the Leisters back into the room and asked defendant to repeat before them the account he had just given the detectives. Detective Ashley then informed the parents that he was taking defendant to the State Police station for further questioning and requested that defendant's parents join them there. It was then 9:00 p.m.; the police questioning at defendant's home had lasted about 50 minutes.

At the police station, defendant was placed in a room, where his parents joined him a few minutes later. After ten or fifteen minutes, the police, including Detective Ashley, entered the room and read defendant his *Miranda* rights. When Detective Ashley asked defendant if he understood his rights, defendant responded that he was uncertain. Detective Ashley then repeated and explained to defendant each of his *Miranda* rights individually. Defendant then stated that he understood his rights. The police then asked defendant to repeat his account, which Marine did in a statement that was taped and lasted seventeen minutes. Defendant retold the account he had previously given at home, of having accidentally hit victim with the steel grate. The tape was then turned off, and the accounts differ as to what happened over the next thirty minutes.

Detective Ashley recalls telling defendant that the police knew how the girl was killed, and that defendant's version could not have happened. John Marine remembers Detective Ashley stating that the little girl had been beaten and then choked to death. When defendant then said that his hand had slipped around Amanda's neck in the course of a shoving match, the detective told defendant that he was lying again. Defendant's stepfather, Mr. Leister, recalls that the detective told defendant that it had been a choke hold and then asked defendant if he had lifted her up, to which defendant replied, "I guess so." According to John Marine, Detective Ashley then proceeded to give a detailed explanation of how Amanda had been beaten and then lifted off the ground by a choke hold with an arm around her neck, after which defendant agreed with the detective's description. Detective Ashley states that defendant volunteered, without prompting, that there had been a fight between defendant and Amanda, and that defendant had picked her up from behind with his arm around her neck and held her until she stopped moving and then had dropped her

in the creek. The detective denied telling defendant that Amanda had been strangled, but did admit telling defendant that they had found bruises on her chest and throat.

On further urging from defendant's stepfather, as well as his brother John, defendant then gave a different statement. Defendant stated that he had been down by the creek building a bridge when Amanda Hemphill walked up to him. She told him he couldn't build a bridge there since it was on someone else's property. Defendant stated that he told her to leave him alone, but "she got in his face and he pushed her into a tree and she hit her chest and fell down." She got up and "got in his face" again. He hit her several more times and grabbed her from behind. He placed his arm around her neck, with the crook of his elbow at her throat. Defendant described how he lifted victim up off the ground and tightened his arm around her neck. When she stopped moving, defendant let her feet touch the ground and shoved her into the creek, face down. Defendant stated that he thought he saw her leg move. He then heard his sister calling him to the house so he ran home. Detective Ashley turned the tape recorder back on and defendant repeated on the tape what he had just said. Defendant was then placed under arrest and charged with murder in the second degree. Defendant was indicted on December 8, 1987 by a grand jury for murder in the first degree.

I

Prior to trial the defense moved to suppress both Marine's oral admission made at home and his taped confession at the police station. After an evidentiary hearing, Superior Court denied Marine's motions and admitted at trial both his oral admission at home and his taped confession at the police station. On appeal, Marine reasserts a three-fold argument against the trial court's rulings: (1) that his admission at home was obtained as a result of custodial interrogation without his having been previously Mirandized; (2) that his waiver of Miranda rights at the station was not knowingly and intelligently made; and (3) that both of his statements were involuntary and the result of police coercion through the use of manipulative and deceptive practices.

A.

■ As to his oral admission at home, Marine asserts that the police came to his home for the purpose of obtaining an incriminating statement from him because by then he was their primary, if not only, suspect. Marine further asserts that even if his initial questioning was "noncustodial" in nature, it became a custodial interrogation as soon as the police "caught Marine in a lie." Marine refers to his initial denial of having known Amanda Hemphill and his denial of having been in the creek within the past ten days. At that point in the interrogation, Marine argues, the police had probable cause to suspect him, if not to arrest him, for having caused her death. Therefore, the defense argues that the admission at trial of Marine's confession at home to having accidentally caused victim's death was erroneous due to the failure of the police to earlier Mirandize him.

The State concedes that by Sunday evening, Marine had become the "focus" of the investigation. The State further concedes that the questioning of Marine by Detectives Ashley and Wilson constituted "interrogation" as defined under Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The State further concedes that the Miranda rule is fully applicable to juveniles. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1987). However, the State contends that Miranda warnings were not required because the interrogation was not "custodial" as defined under Miranda.

* * *

■ We turn to defendant's first argument, that his Fifth Amendment rights as extended by Miranda were violated by his interrogation at home. The Fifth Amendment to the United States Constitution guarantees that no person "shall be compelled in any criminal case to be a witness

against himself." [3] *Miranda* extended that right to in-custody interrogation of a person suspected or accused of a crime and established a procedure to assure that custodial interrogations do respect that right. More specifically, it established that law enforcement officials may not constitutionally subject citizens to custodial interrogation without their having been first advised of certain rights protective of their Fifth Amendment privilege against self-incrimination. *Miranda*, 384 U.S. at 436, 86 S.Ct. at 1602, 16 L.Ed.2d at 694.[4] The obligation of police to duly warn a suspect of his Fifth Amendment rights before interrogation was crafted to address "the problem of confessions obtained from suspects in police custody."

> Not only is custodial interrogation ordinarily conducted by officers who are "acutely aware of the potentially incriminatory nature of the disclosures sought," but also the custodial setting is thought to contain "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." To dissipate "the overbearing compulsion ... caused by isolation of a suspect in police custody," the *Miranda* Court required the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it. We have consistently held, however, that this *extraordinary safeguard "does not apply outside the context of the inher-*

*ently coercive custodial interrogations for which it was designed."*

*Minnesota v. Murphy*, 465 U.S. at 429–30, 104 S.Ct. at 1143–44, 79 L.Ed.2d at 421 (quoting *Roberts v. United States*, 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622, 631 (1980)) (emphasis added) (citations omitted). Thus, such warnings are required only where (1) questioning of a suspect rises to the level of "interrogation"; *and* (2) the interrogation occurs while the suspect is either in "custody" or in a "custodial setting." *Miranda*, 384 U.S. at 460, 461, 86 S.Ct. at 1620–21, 16 L.Ed.2d at 715–16. *Miranda* describes a custodial interrogation as meaning "questioning initiated by law enforcement officers after the person has been taken into custody or otherwise deprived of his freedom in any significant way." *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706.

The legal standard used to determine "custody" for *Miranda* purposes has been well defined. "[T]he ultimate test [is] simply whether there [was] ... 'restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983). *See Minnesota v. Murphy*, 465 U.S. at 430–31, 104 S.Ct. at 1144, 79 L.Ed.2d at 421; *Berkemer v. McCarty*, 468 U.S. 420, 439–41, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334–35 (1984); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). *Miranda* rights have been extended beyond formal in-custody interrogation in a police station: to questioning of a suspect while in prison on a separate offense, *Mathis v. United States*, 391 U.S. 1,

---

**3.** This privilege applies to state action through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

**4.** The requirements of *Miranda* are the exception to the general rule that "a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must *assert* the privilege rather than answer if he desires not to incriminate himself." *Minnesota v. Murphy*, 465 U.S. 420, 429, 104 S.Ct. 1136, 1142, 79 L.Ed.2d 409, 420 (1984) (emphasis added). The general obligation of a witness to answer questions truthfully does not convert otherwise truthful and vol-

untary statements into compelled ones that must be suppressed.

> The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment.

*Id.* at 427, 104 S.Ct. at 1142, 79 L.Ed.2d at 419 (quoting *United States v. Monia*, 317 U.S. 424, 427, 63 S.Ct. 409, 410–11, 87 L.Ed. 376, 380 (1943)).

88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), and to questioning of a suspect in his home "after he has been arrested and is no longer free to go where he pleases." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) (citing *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969)). *Orozco* extended the ruling in *Miranda* to police questioning of a suspect in his home only where the defendant was then "under arrest and not free to leave when he was questioned." *Orozco*, 394 U.S. at 327, 89 S.Ct. at 1097, 22 L.Ed.2d at 315. Justice White, in a strongly worded dissent, joined in by Justice Stewart, found even this extension of *Miranda* to be "unwarranted," in ignoring *Miranda*'s purpose: "to guard against what was thought to be the corrosive [sic] influence of practices which station house interrogation makes feasible." *Id.* at 329, 89 S.Ct. at 1098, 22 L.Ed.2d at 316 (White, J. dissenting). Also instructive is the Court's insistence in *Mathiason* that interrogation merely in a "coercive environment" cannot be equated with custodial interrogation. The Court stated:

> [A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which

*Miranda* by its terms was made applicable, and to which it is limited.

*Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719 (emphasis in original).

■ The determination in a particular case of whether interrogation occurs in a custodial setting, so as to trigger the requirement of *Miranda* safeguards, must be made by applying an "objective reasonable man standard" to a totality of circumstances test. In *Torres v. State*, this Court recently quoted from *United States v. Phillips*, 11th Cir., 812 F.2d 1355, 1360 (1987):

> [I]n order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such an extent that he would not feel free to leave.

Christie, C.J. (Del.Supr.1992) 608 A.2d 731 (ORDER). The Court in *Phillips* further explained:

> The Court has also expressly adopted an objective, reasonable man standard as the appropriate test in cases involving custody issues "because, unlike a subjective test, it 'is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does [it] place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.'" *Berkemer v. McCarty*, 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 3152 [82 L.Ed.2d 317, 336] (1984) quoting *People v. P.*, 21 N.Y.2d 1, 286 N.Y.S.2d 225 [232], 233 N.E.2d 255, 260 (N.Y.1967). In applying the objective test, therefore, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."

*Phillips*, 812 F.2d at 1359–1360 (citation omitted). Here, following the suppression hearing, the trial court ruled:

> The Court is persuaded that although the defendant was a suspect in the minds of the police there was no formal arrest or restraint on his freedom of movement to the degree associated with a formal ar-

rest until after his last statement at approximately 9:00 p.m. Because the defendant was not in custody at his residence, *Miranda* warnings were not required there.

Our standard of review of the trial court's finding that Marine was not in custody during his interrogation at home is well established. A determination of whether a defendant is in custody for *Miranda* purposes, being a question of fact for a trial court to make, will be sustained by an appellate court unless clearly erroneous. *Albury v. State,* Del.Supr., 551 A.2d 53, 60 (1988); *Martin v. State,* Del.Supr., 433 A.2d 1025, 1032–33 (1981), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 306 (1982); *State v. Rooks,* Del.Supr., 401 A.2d 943, 949 (1979).

The trial court, in concluding that Marine was not in custody while being interrogated at home, summarized the facts:

The relevant facts for purposes of the motion are as follows: At approximately 8:00 p.m., on November 23, 1987 Detectives Ashley and Wilson arrived at the home of Mr. and Mrs. Bruce Leister for the purpose of interviewing the defendant Fred Marine, Mrs. Leister's son, regarding the death of Amanda Hemphill, age 10. The defendant at the time was fourteen years and five months old, in the eighth grade and of at least average intelligence. At school he was in special education classes for the socially and emotionally maladjusted.

The defendant's 19 year old brother John Marine knew the police wanted to talk to the defendant and John had telephoned them earlier to advise that the defendant and his parents were home. They had returned from a trip out of state and had yet to eat dinner.

The police were given permission to enter the home and the initial interview of the defendant occurred in Mr. and Mrs. Leister's bedroom in the presence of his mother and other family members at approximately 8:10 p.m.

Discussions soon focused on items of the defendant's clothing and the place of the interview moved to the defendant's bedroom. During the course of the interview, Detective Ashley explained to the defendant's mother that the defendant was a suspect, but that he was not being accused. Both the defendant's brother and his mother told the defendant to tell the truth. In response the defendant said he was telling the truth and he did not know anything.

Defendant then went with his mother to the kitchen where she strongly urged him to tell the truth in the presence of Detective Wilson. Meanwhile, in a bedroom Detective Ashley told Mr. Leister he did not believe the defendant and he explained some of his findings in the case. Mr. Leister agreed with Detective Ashley's assessment.

The defendant, his mother, and Detective Wilson returned to the bedroom where the defendant's mother again urged him to tell the truth stating she could not believe he did it, but she thought he saw something.

The defendant began to cry and then told of seeing a man running from the creek where the victim was found. Detective Ashley told the defendant that things did not add up; that he was only trying to find out what happened. He said that for all he knew it could have been an accident. Mrs. Leister then told her son: "If you did something to that little girl and it was an accident, just say so." Defendant began to cry and he asked everyone to leave the bedroom except Detective Ashley. Ashley then sat on the bed next to the defendant and befriended him by placing his right arm around him. He asked the defendant to tell the truth. The defendant then explained that it was an accident giving various details of what happened to Amanda Hemphill at the creek.

The detective then escorted the defendant out of the bedroom and told Mr. and Mrs. Leister to come to Troop 3. The detectives transported the defendant to Troop 3 without questioning him or discussing the case. The defendant was not handcuffed, but the detectives did consider him in custody.

On appeal, Marine argues that the trial court abused its discretion and erred as a matter of law in failing to find Marine's *Miranda* rights to have attached as soon as "the police caught the defendant in a lie, and especially once they found the muddy shoes," in view of Marine's original denial of having been in the creek the previous Friday afternoon and of having known Amanda Hemphill. Marine argues that the police at that point had "probable cause to suspect the defendant was the culprit" and indeed "probable cause to place the defendant under arrest."

We reject Marine's contention that his interrogation shifted as a matter of law from noncustodial to custodial the moment he was "caught in a lie." The defense's contention that Marine thereby became a "prisoner in his house [and] ... it was no different than if he had been at the Troop, handcuffed and alone with the police," is erroneous for two reasons: *one,* it misstates the question; and *two,* it simply disputes the findings of the trial court to the contrary, without establishing them to be clearly erroneous.

■ The fundamental flaw in Marine's contention is that he would have us determine the existence of "custody" from the perspective of the interrogator. *See State v. Roman,* 70 Haw. 351, 772 P.2d 113, 116 (1989). Such a rule is plainly at odds with the well-established standard and contrary to *Miranda*'s raison d'etre. The evil which the Fifth Amendment and *Miranda* seek ultimately to eliminate is coercion. *Shipley v. State,* Del.Supr., 570 A.2d 1159, 1167 (1990). The existence of custodial interrogation is therefore to be determined from the perspective of a reasonable man in the position of the suspect, not from the perspective of the police. *United States v. Phillips,* 11th Cir., 812 F.2d 1355 (1987).

### B.

■ Marine next contends that his confession at the station house was not established by the State to have been the product of a knowing and intelligent waiver of his *Miranda* rights.

The general requirements for a suspect's waiver of his *Miranda* rights under the Fifth Amendment prior to in-custody interrogation are well established. "[A] suspect may waive his Fifth Amendment privilege, 'provided the waiver is made voluntarily, knowingly and intelligently.'" *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954, 965 (1987). "The thrust of the fifth amendment is to prevent government coercion." *Shipley v. State,* Del.Supr., 570 A.2d 1159, 1167 (1990) (citing *Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473, 486 (1986)). That is, a suspect must be free from government compelled self-incrimination. Thus, the *Miranda* rule is clear. "In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation." *Fare v. Michael C.,* 442 U.S. 707, 717, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197, 207 (1979).

■ The record is clear that Detective Ashley carefully and fully delineated the requirements of *Miranda.* Nevertheless, Marine thereafter made inculpatory statements without benefit of counsel. The question therefore becomes whether the State met its burden of proving that this waiver by Marine of his privilege against self-incrimination and his right to retained or appointed counsel was knowing and intelligent. The State's burden is proof by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. at 168, 107 S.Ct. at 522, 93 L.Ed.2d at 485. The question of whether an accused has waived his rights "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." This determination must also be made under a "totality of the circumstances" inquiry. *Fare,* 442 U.S. at 725, 99 S.Ct. at 2571–72, 61 L.Ed.2d at 212. A judicial inquiry into a valid waiver of a suspect's *Miranda* rights has "two distinct dimensions":

First, the relinquishment of the right must have been voluntary in the sense

that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986).

The record reveals that before Detective Ashley advised defendant of his *Miranda* rights, Marine had been placed in an interview room at the station for approximately fifteen minutes. Marine's parents and his brother then joined him. According to Detective Ashley, Marine was then in custody, but had not been placed under formal arrest. The Detective then read Marine his rights for the first time.[5] Asked whether he understood his rights, Marine responded, "sort of." When asked, "Is there anything in there that you don't understand," Marine responded, "I don't know it that much." The Detective then turned to Marine's mother and asked her if she understood the rights, to which she replied, "yes." The Detective then stated to Marine's mother:

> At the house he wasn't in custody and he wasn't being accused. He was merely as a suspect at that point. Now he's in custody and before any formal interviews are taken we read Miranda warnings. Do you understand Miranda warnings?

When Marine's mother replied, "No, sir, I don't recall exactly," Detective Ashley stated to Marine:

> We'll go over them step by step, okay, just for you. I'm sure your mother and your stepfather, okay.

You have the right to remain silent. The first part of the Miranda warnings merely stating that you have the right. You don't have to say anything if you don't want to say anything, okay.

The second part says anything you say can and will be used against you in a court of law. It merely means what we say here in this statement will be used against you in a court if need be.

The next thing, number three, you have the right to talk to a lawyer and have him present with you while you're being questioned. It states if you want a lawyer you can have one. I can't keep you from having a lawyer.

The fourth one states if you can't afford to hire a lawyer one will be appointed to represent you before any questioning if you wish one. That merely states if you can't afford an attorney, that you're indigent or you don't have the funds to afford an attorney, that the State will appoint one to represent you before any questioning.

If you don't want to talk now, you want an attorney, the State will appoint one for you if you can't afford one or if your parents can't afford one.

The fifth one if you decide to answer any questions with or without an attorney present you may stop at any time during the questioning. This means whenever you feel like you don't want to say anymore, don't want to talk anymore, it's your right, your privilege to say I stop, I don't want to do anymore. Whether you have an attorney here with you or not if you're by yourself or with your parents. Is there anything in here you don't understand?

According to Detective Ashley, Marine responded, "I understand it now."

On the record testimony before it, the trial court, after reviewing the tape recorded statement, found that defendant's *Miranda* rights had been "carefully explained

---

**5.** Detective Ashley stated: "I initially read the rights. The first time I explained: You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to speak to an attorney. If you cannot afford one, one will be appointed to represent you before any questioning if you wish one. If you decide to answer any questions with or without an attorney present, you may stop at any time during the questioning. Do you understand each of these rights I have explained to you?"

to him" by Detective Ashley in the presence of defendant's mother, stepfather and brother; that defendant had "expressly indicated that he understood his rights"; and that Marine's waiver of his *Miranda* rights was "voluntary" and with "no coercive police activity or overreaching by them."

On appeal, the defense does not directly challenge the trial court's findings of waiver as clearly erroneous and not supported by the record. Nor does defendant argue that the trial court committed legal error by misapplying constitutional principles or controlling federal or state precedent. Rather, defendant seeks to enlarge the requirements of waiver applicable to a youth of Marine's age, and specifically as to Marine, by requiring the police, first, to inform Marine that any incriminating statement made could be admitted at trial if he were later prosecuted as an adult, as in fact occurred; and second, to require the giving of *Miranda* warnings to the parents as well, and to provide parents and child an opportunity to discuss the matter in private before the child reaches a decision whether to waive. Additionally, defendant argues that the trial court abused its discretion in failing to find Marine's waiver to have been procured by police duplicity and deception amounting to coercion by failing to give "sufficient weight" to Marine's age and limited intellect and maturity.

Marine's arguments run counter to teachings of both the United States Supreme Court and the rulings of this Court, both with respect to the breadth of the warning to be given and the suspect's awareness of the consequences of a waiver.

The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

*Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 857–58, 93 L.Ed.2d 954, 966 (citations omitted). *See also Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985). ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.") This Court has recently endorsed this principle. "The fifth amendment does not guarantee *a fully informed choice* or the adequacy of an attorney's advice, nor is the right to remain silent concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Shipley v. State,* Del.Supr., 570 A.2d 1159, 1168 (1990) (citing *Colorado v. Connelly,* 479 U.S. at 170, 107 S.Ct. at 523, 93 L.Ed.2d at 486, quoting *Oregon v. Elstad,* 470 U.S. at 305, 105 S.Ct. at 1291, 84 L.Ed.2d at 229)) (emphasis added). The question in each case is "whether the defendant's will was overborne" by official coercion when a statement was made. *Baynard v. State,* Del.Supr., 518 A.2d 682, 690 (1986) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854, 862 (1973)).

The benefit of the *Miranda* rule, with its "specificity" and relative simplicity, would, we think, be undermined by the adoption of variations on the rule for minors depending upon the crime to be charged and the age and intellectual and emotional makeup of the particular minor. We see no reason not to determine a question of *Miranda* waiver under a totality of the circumstances test. *See Fare,* 442 U.S. at 725, 99 S.Ct. at 2572, 61 L.Ed.2d at 212. ("This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a

juvenile has waived his rights, as opposed to whether an adult has done so.")

In this case, the record reveals that the trial judge adhered to the previous admonitions of this Court that the "confessions and admissions of a juvenile require special scrutiny," and did so in the context of applying the totality of the circumstances test. *Haug v. State*, Del.Supr., 406 A.2d 38, 43 (1979). The Court found:

In this case, the defendant was fourteen years and five months old, of average intelligence and in the eighth grade. Although he was in special classes for the socially and emotionally maladjusted, his ability to understand his constitutional rights was not impaired. The questioning at his residence lasted only fifty minutes and the questioning at Troop 3 only forty-eight minutes all between the evening hours of 8:00 and 11:00 p.m. The defendant was provided soda and crackers at Troop 3 and made no other requests for food.

At Troop 3 he was allowed time alone with his family before any questioning. At Troop 3 all questioning was preceded by a careful explanation of the defendant's constitutional rights and the defendant's unequivocal waiver of them.

The detectives made no threats and engaged in no physical coercion. All of the questioning was in the presence of the defendant's family except for the brief period in his bedroom when the defendant asked to speak with Detective Ashley alone.

Although Detective Ashley on various occasions urged defendant to be honest and tell the truth, adjurations to tell the truth unaccompanied by any threat, promise, trick or improper inducement sufficient to overbear the defendant's will do not make a statement involuntary.

Defense counsel points to the several instances when the defendant's mother, stepfather or brother exhorted the defendant to tell the truth at circumstances which render the statements involuntary. These exhortations were not made on behalf of the police and in any event none of them was accompanied by any threat, promise, trick or improper inducement. I am satisfied by a preponderance of the evidence that the defendant's will was not overborne.

Although each case must be decided on its own facts, I note cases in several other jurisdictions have refused to suppress a juvenile's statement as involuntary simply because a parent or guardian urged the juvenile to tell the truth to the police.

\* \* \* \* \* \*

Furthermore, I am satisfied there was no coercive police activity in this case. In Colorado vs. Connelly 479 U.S. 157 decided in 1986 the United States Supreme Court held that coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the due process clause.

In reaching this conclusion, the Court has been guided by the rule that special consideration must be employed to determine the admissibility of statements made by a juvenile. Even when guided by this high standard, the Court must base its decision on the facts as I find them to be from the evidence.

The Superior Court then denied the defendant's motion to suppress, reserving to defendant the right to "argue before the jury the issues of voluntariness and the weight to be given to this evidence."

In *Torres*, this Court addressed and rejected a contention that *Miranda* warnings to juveniles should be expanded to include "an additional warning that the juvenile could be tried and convicted as an adult." *Torres v. State*, Del.Supr., No. 151, 1990, Christie, C.J. (Feb. 7, 1992) (ORDER), at 6. See *Haug*, 406 A.2d at 43 (rejecting "the interested adult rule"); *State v. Benoit*, 126 N.H. 6, 490 A.2d 295 (1985). Here, too, we find Superior Court to have conducted a careful evaluation of Marine's waiver in the context of a totality of the circumstances test. The record supports the court's finding that Marine's waiver of his rights was both knowing and voluntary and that his will was not overborne by police coercion or

improper inducement. Indeed, the *Miranda* warnings given Marine included the explicit admonition of Detective Ashley that anything Marine said "will be used against you in a court if need be." We decline to find those warnings to be deficient as a matter of law. Marine was thereby fully warned of the consequences of his failure to assert his *Miranda* rights after a full and adequate explanation of those rights. The record supports the required dual findings: (1) that the relinquishment of his right was the product of a deliberate choice, free of official intimidation, coercion or deception; and (2) that Marine's waiver was made with awareness of both the right being abandoned and the consequences of the abandonment. *Moran v. Burbine*, 475 U.S. at 421, 106 S.Ct. at 1141, 89 L.Ed.2d at 420–21.[6] We therefore affirm Superior Court's refusal to suppress the admission of Marine's station house confession based on the contention that Marine's *Miranda* rights were not validly waived.

### C.

■ We now turn to Marine's remaining contention that, apart from the requirements of *Miranda*, both his oral admission at home and his station house confession were inadmissible because they were involuntary. In support, he states that his will was "overborne" and concludes that none of his statements were the product of a rational intellect and free will. *See Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77, 79 (1968); *Jackson v. Denno*, 378 U.S. 368, 390, 84 S.Ct. 1774, 1788, 12 L.Ed.2d 908, 923 (1964); *Shipley v. State*, Del.Supr., 570 A.2d 1159, 1167–68 (1990); *Baynard v. State*, Del. Supr., 518 A.2d 682, 690 (1986).

■ The question of voluntariness of an admission is a question of fact to be determined from the totality of the circumstances. *Shipley*, 570 A.2d at 1168; *Baynard*, 518 A.2d at 690; *State v. Rooks*, Del.Supr., 401 A.2d 943, 949 (1979). Here

also, Marine does not contend that the trial court committed legal error by applying an erroneous standard of review for determining whether his statements were voluntary. Conceding that the evidence must be viewed in a light most favorable to the State, Marine contends that the trial court's finding of lack of police coercion and intimidation at home and at the station was clearly erroneous. The defense argues that this is a clear case of "police overreaching" and coercive interrogation, requiring this Court to conclude that the trial court's determination that Marine's confessions were voluntary is not supported by substantial evidence.

■ For an admission or confession to be found involuntary, the court must find that the admission or confession was the result of *"coercive* government *misconduct"* which is causally related to the confession. *Colorado v. Connelly*, 479 U.S. at 163, 107 S.Ct. at 520, 93 L.Ed.2d at 482 ("absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law").

Defendant contends that the record requires a finding that the "free will" of Marine was overborne by the police, acting in concert with Marine's family, to "bully" and "intimidate" Marine into ultimately admitting his crime. However, defendant points to no evidence of police coercion of Marine rising to the level of "overreaching" or "outrageous behavior." *Id.* Giving due consideration to defendant's age, we can find no evidence of excessive or inappropriate police conduct sufficient to rebut the trial court's findings. Nor does the defense point to any evidence that Marine was not competent in the sense of being unable to exercise his "free will." *Id.* at 173, 107 S.Ct. at 525, 93 L.Ed.2d at 488 (Stevens, J., concurring). The trial court found all of defendant's statements to have been voluntary "within the meaning of the due process clause." We affirm

---

6. This Court reached a different result under the Delaware Constitution in *Bryan v. State*, Del. Supr., 571 A.2d 170 (1990).

such findings as supported by competent evidence, and not clearly erroneous. *Albury v. State,* Del.Supr., 551 A.2d 53, 60 (1988); *Baynard,* 518 A.2d at 690–91.

## II

 We next take up defendant's contention that Superior Court was without jurisdiction under 10 *Del. C.* § 921(2) to sentence him for his conviction of the lesser included offense of murder in the second degree. The question presented is whether Superior Court, having indisputably acquired jurisdiction over Marine to try him as an adult under an indictment of first degree murder, 11 *Del. C.* § 636(a)(1), lost jurisdiction for conviction or sentencing purposes when the jury found defendant *not guilty* of murder in the first degree and guilty only of the lesser included offense of murder in the second degree. If he had been tried originally only on a second degree murder charge, Marine could not have been subjected to Superior Court jurisdiction, and thus could not have been sentenced as an adult on conviction.

 Raising this issue on appeal,[7] Marine contends that his sentence of life imprisonment and his conviction of murder in the second degree, must be set aside as jurisdictionally barred and the case returned to Family Court for civil proceedings against Marine as a delinquent, as if newly charged with second degree murder. Marine grounds his argument on statutory interpretation and legislative intent, and otherwise on a claim of denial of equal protection and due process.

The question presented requires analysis of the pertinent Delaware statutes. The parties agree that the relevant statutes are found within 10 *Del. C.,* subchapter II, defining the jurisdiction and powers of the Family Court of Delaware and, in particular, section 921, entitled **"Exclusive original civil jurisdiction,"** and within subchapter III, Part A, titled "PROCEEDINGS IN THE INTEREST OF A CHILD," and, in particular, section 938, captioned **"Proceeding against child as an adult; amenability proceeding; referral to another court."** These sections state, in pertinent part:

§ 921. **Exclusive original civil jurisdiction.**

The [Family] Court shall have exclusive original civil jurisdiction in all proceedings in this State concerning:

(1) Any child found in the State who is alleged to be dependent, neglected, or delinquent except as otherwise provided in this chapter;

(2)a. Any child charged in this State with delinquency by having committed any act or violation of any laws of this State or any subdivision thereof, *except:* Murder in the first degree, rape, unlawful sexual intercourse in the first degree, kidnapping; any child 16 years of age or older charged with violating Title 21 of the Delaware Code, except as provided in § 927 of this title;[8] or any other crime over which the General Assembly has granted or may grant jurisdiction to another court.

b. Any child charged in this State with delinquency by having committed, after reaching his 16th birthday, murder in the second degree, manslaughter, robbery in the first or second, attempted murder (first or second degree), burglary in the first degree or

---

7. This issue was not addressed by the court below because not raised by defendant, admittedly by oversight; nor was it raised in defendant's opening brief of the appeal. This Court, over the State's opposition, granted defendant leave to raise and brief the issue under plain error standards and in the interest of justice and judicial economy. *Marine v. State,* Del.Supr., No. 180, 1989, Horsey, J. (March 21, 1990) (ORDER). Issues of subject matter jurisdiction of the trial court may be raised at any stage of the proceedings. *Cane v. State,* Del.Supr., 560 A.2d 1063 (1989); *Scott v. State,* Del.Supr., 117 A.2d 831, 835 (1955). *See Government of the Canal Zone v. Burjan,* 5th Cir., 596 F.2d 690, 693 (1979). *See also Wainwright v. State,* Del.Supr., 504 A.2d 1096, 1100 (1986). In any event, the issue, being one of law, would, if raised below, be reviewable *de novo.*

8. Title 21 relates exclusively to motor vehicles; § 927 otherwise confers exclusive jurisdiction on Family Court over all proceedings involving children charged with violating specified provisions of the motor vehicle code.

arson in the first degree; provided, however, that such child shall, after his first appearance in the Court, be given a hearing as soon as practicable to determine his amenability to the processes of the Court. The Court shall give immediate notice of such hearing in writing to the Department of Justice and to the child's custodian, near relative, attorney or other interested person, if known, and then the Court shall proceed in accordance with the provisions of § 938 of this chapter. The Attorney General or one of his deputies shall be present at any such hearing.

Superior Court shall retain jurisdiction for purposes of sentencing if any judge or jury shall find the child guilty of a lesser included crime following a trial of 1 of the crimes *specifically defined in this subsection* or any crime in the case where the child has been transferred to the Superior Court by the Family Court pursuant to § 938 hereof; ...

(emphasis added).

\* \* \* \* \* \*

## § 931. Delinquent child not criminal; prosecution limited.

Except as provided in § 938, no child shall be deemed a criminal by virtue of an allegation or adjudication of delinquency, nor shall a child be charged with or prosecuted for a crime in any other court. In this Court the nature of the hearing and all other proceedings shall be in the interest of rather than against the child. Except as otherwise provided, there shall be no proceedings other than appellate proceedings in any court other than this Court in the interest of a child alleged to be dependent, neglected, or delinquent.

\* \* \* \* \* \*

## § 938. Proceeding against child as an adult; amenability proceeding; referral to another court.

(a) A child shall be proceeded against as an adult where:

(1) The acts alleged to have been committed constitute first degree murder, rape, unlawful sexual intercourse in the first degree or kidnapping;

(2) The child has reached his 16th birthday and is not amenable to the rehabilitative processes available to the Court;

(3) The General Assembly has heretofore or shall hereafter so provide.

(b) In all cases specified in (a) the Court shall, upon application, hold a preliminary hearing and, if the facts warrant, thereafter refer the child to the Superior Court or to any other court having jurisdiction over the offense for trial as an adult.

(c) When a child has reached his 16th birthday and is thereafter charged with being delinquent, the Court may, on motion of the Attorney General or upon its own motion ... defer further proceedings in the Family Court and conduct a hearing to determine whether the child is amenable to the rehabilitative processes of the Court. In determining whether the child is so amenable, the Court shall take into consideration, among others, the following factors which are deemed to be nonexclusive:

(1) Whether, in view of the age and other personal characteristics of the child, the people of Delaware may best be protected and the child may best be made a useful member of society by some form of correctional treatment which the Family Court lacks power to assign; or

(2) Whether it is alleged death or serious personal injury was inflicted by the child upon anyone in the course of commission of the offense or in immediate flight therefrom; or

(3) Whether the child has been convicted of any prior criminal offense; or

(4) Whether the child has previously been subjected to any form of correctional treatment by the Family Court; or

(5) Whether it is alleged a dangerous instrument was used by the child; or

(6) Whether other participants in the same offense are being tried as adult offenders.

If it decides that the child is amenable, it may proceed to hear the case. If it decides that he is not amenable, it shall refer the child to the Superior Court or to any other court having jurisdiction over the offense for trial as an adult.

Marine finds in section 938, in conjunction with section 931, a legislative intent to permit only two classes of children to be tried *and* convicted as adults in Superior Court: (1) children of any age charged *and* convicted of any of the crimes delineated in section 938(a)(1); and (2) children sixteen years of age or over charged with specified offenses *and* whom Family Court has found to be nonamenable to its "rehabilitative processes" pursuant to procedures and standards set forth in sections 921(2)b and 938(c). Because the Legislature has excluded children under sixteen from being subjected to the amenability process for trial as adults in Superior Court, Marine argues that Superior Court "lost" jurisdiction over him for both conviction and sentencing purposes for any found lesser included crime to murder in the first degree.

Purporting to read the Delaware statutory scheme "as a whole," Marine finds a clear legislative intent that *all* children under sixteen years of age whether originally charged *or* later found to have committed murder in the second degree shall be exclusively proceeded against civilly in Family Court as delinquents under section 931. Marine argues that neither section 921(2)a nor section 938(a)(1) includes murder in the second degree as an offense for which a child may be proceeded against criminally as an adult unless the child is sixteen years of age or older and has been first found to be nonamenable by Family Court. Marine submits the legislative design to be that Family Court is conferred exclusive jurisdiction over "non-capital" felonies committed by children under sixteen. Therefore, Marine argues, we must conclude that the Legislature intended to divest Superior Court of jurisdiction to either convict or to sentence Marine on the jury's finding of guilty of murder in the second degree.

Marine asserts that his discernment of legislative intent is confirmed by the explicit language of subsection b of section 921(2). Because subsection b states that Superior Court's lesser included sentencing jurisdiction is confined to "trial of 1 of the crimes specifically defined in this subsection," Marine argues that the words "this subsection" clearly refer only to subsection b of section 921(2), and not to all of subsection (2) of 921. Thus, Marine concludes, Superior Court's conferred lesser included sentencing jurisdiction is confined to the sentencing of a child sixteen or over who has been referred to Superior Court from Family Court as nonamenable to its processes, and does not extend to a child of any age originally prosecuted as an adult under section 938(a)(1).

The State counters with two basic arguments: (1) that jurisdiction, having been vested in Superior Court under sections 921(2)a and 938(a), may not be divested by implication; and (2) that the Legislature's provision that Superior Court "shall retain jurisdiction for purposes of sentencing ... the child [found] guilty of a lesser included crime," 10 *Del. C.* § 921(2)b, refers to any child prosecuted as an adult for any crime, regardless of whether Superior Court's jurisdiction is derived from section 921(2)a or 921(2)b. Thus, the State, in effect, argues that Superior Court's conferred jurisdiction to sentence for lesser included offenses is unqualified and applies to all charged and found offenses: (1) any criminal offense for which a child of any age originally charged under Superior Court's *exclusive* jurisdiction is ultimately convicted; and (2) any criminal offenses charged to a child sixteen or over who becomes subject to Superior Court's *derivative* jurisdiction through transfer from Family Court following a finding of nonamenability pursuant to sections 921(2)b and 938(c).

The State also asserts that Marine's construction of the word "subsection," found in the last unlettered subparagraph of section 921(2) (as evidencing legislative intent to limit Superior Court's lesser included sentencing jurisdiction to those crimes defined under subsection b of section 921(2)),

leads to an absurd result: that Superior Court's jurisdiction to sentence for lesser included offenses of crimes to which that court has been conferred exclusive original jurisdiction would be more restrictive than that court's lesser included sentencing jurisdiction of crimes as to which Superior Court's jurisdiction is derived from Family Court through a nonamenability finding. The State concludes that the Delaware statutory scheme, when read as a whole, clearly supports a finding that Superior Court's lesser included sentencing jurisdiction applies to any child over whom Superior Court has been conferred jurisdiction, including those children charged with a section 938(a)(1) offense, and thus extends to Marine.

\* \* \*

■■■■ Delaware law is well settled that if statutes are plain and unambiguous, we must give effect to the clear legislative command "without referring to any traditional aids of statutory interpretation." *Richardson v. Wile,* Del.Supr., 535 A.2d 1346, 1349 (1988). To determine whether a statute is ambiguous on its face requires reading the statute "as a whole." *Id.* at 1350. "[S]tatutory language is ambiguous only when it is *reasonably* susceptible to different conclusions or interpretations." *State v. Cooper,* Del.Supr., 575 A.2d 1074, 1076 (1990) (citing *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.,* Del. Supr., 492 A.2d 1242, 1246 (1985)) (emphasis in original).

We conclude that the statutes in question are ambiguous. As the arguments of the parties make clear, the statutory language is susceptible on its face to different reasonable interpretations. In applying well-established constructional aids, our search is for legislative intent. *Spielberg v. State,* Del.Supr., 558 A.2d 291, 293 (1989). In seeking legislative intent, it is frequently helpful at the outset to trace the legislative history of the statutory scheme, here the disposition of a child charged with a violation of state law.

With the creation in 1945 of the first Family Court of Delaware, 45 *Del.Laws,* c. 241, Family Court was conferred exclusive jurisdiction over any child charged with any state law violation except murder in the first degree, rape, kidnapping and certain motor vehicle offenses. *See* 10 *Del. C.* § 921(2)a; *State v. J.K.,* Del.Supr., 383 A.2d 283, 286 n. 5 (1977). In *J.K.,* this Court viewed the legislative history of the Family Court as evidencing a "public policy" determination that minors charged with violations of State law should be divided "into two classes on the basis of the offenses charged." *Id.* at 287. Those charged with particularly defined crimes of the most serious nature (murder in the first degree, kidnapping and rape) should be prosecuted as adults in Superior Court, and all other minors charged with any lesser crimes should be proceeded against civilly in the interest of the child, and within the Family Court's exclusive jurisdiction. Thus, the jurisdictional line was originally clearly drawn.

Thereafter, and since 1947, the Legislature has made a further exception, beyond section 938(a)(1), to Family Court's otherwise exclusive jurisdiction over a child charged with a violation of any State law. In 1947, the Legislature enacted 46 *Del. Laws,* c. 209, titled "AN ACT CONCERNING CERTAIN CRIMES COMMITTED BY JUVENILES BETWEEN THE AGES OF SIXTEEN AND EIGHTEEN YEARS." Without defining the crimes to which the law applied, the Legislature, under section 1 of the Act, conferred authority over the then county Family Courts of Delaware to conduct a hearing, only with respect to children within that age category charged with violation of a State statute, to determine the child's amenability to the processes of the juvenile court. The Act authorized Family Court, with the approval of the Attorney General and the consent of the judge of the court to which the case would be transferred, to proceed against a child of such age as an adult. Under section 2 of the 1947 Act, the statute provided that upon the completion of the process of transferring the child for prosecution as an adult and the entry of an order by the court

assuming jurisdiction ... the same shall constitute a deprivation of jurisdiction

over the person and the offense of the said child of all inferior Courts of this State, and the sole and exclusive jurisdiction of the person and of the offense of the said child shall vest [in the court to which the child was transferred, then either the Court of General Sessions or the Court of Oyer and Terminer].

46 *Del.Laws*, c. 209 § 2. In the 1953 recodification of the Delaware statute laws, section 1 and section 2 of the 1947 Act became respectively sections 2711 and 2712 of Title 11, subchapter II, titled "Prosecution of Children as Adults."

Under the then Delaware statutory scheme, the consequences of the criminal court assuming jurisdiction over a child charged with crimes less serious than those defined under section 938(a)(1) was not subject to dispute. The transfer to Superior Court of jurisdiction of a child for prosecution as an adult was *final* for all purposes. The court acquiring jurisdiction of the child acquired jurisdiction over both "the person and the offense" of the child. The acquiring court's jurisdiction thus extended beyond the offense charged.

The then Delaware statutory scheme mirrored that of other jurisdictions. *See Dicus v. Second Judicial District Court,* 97 Nev. 273, 625 P.2d 1175 (1981) (criminal court which has jurisdiction over juvenile based on crime charged and may accept plea for lesser included charge); *Gray v. State,* 6 Md.App. 677, 253 A.2d 395, 399 (1969) (finding, under statute similar to Delaware's, that once jurisdiction vests in criminal court based on crime charged, jurisdiction is retained to pass sentence for conviction on lesser included crime); *People v. Davenport,* 43 Colo.App. 41, 602 P.2d 871, 872 (1979) (jurisdiction vested in district court based on indictment for first degree murder and retained jurisdiction to sentence fifteen-year-old for murder two conviction when statute provides, "child is ... *alleged* to have committed a crime") (emphasis added); *see also Lucas v. United States,* D.C. Ct.App., 522 A.2d 876, 878 (1987) (sixteen-year-old charged with first

degree murder and convicted of lesser included offense of voluntary manslaughter; trial court retained jurisdiction to sentence under statutory scheme which explicitly excluded such juveniles from the definition of "child").

Thereafter, and until the creation of a statewide Family Court of Delaware in 1971, both sections remained in force, subject to periodic modifications of section 2711 concerning the amenability procedures and changes in the age limits of juveniles to which the process should apply. In 1971, the Legislature, by 58 *Del.Laws,* chapter 114, established the first statewide Family Court of Delaware by merging into one court the previously separately constituted Family Court of the State of Delaware for New Castle County and the Family Court of Kent and Sussex Counties.

By the 1971 Act, the Legislature also relocated the amenability procedures previously found in Title 11 to chapter 9, section 938 of Title 10, with the former provisions of section 2711 restated as subsection (c) of section 938. The Legislature then repealed both sections 2711 and 2712 of Title 11. 58 *Del.Laws,* c. 114 § 4. In lieu of the previously detailed provisions of section 2712 conferring jurisdiction on the criminal court over both the child and the offense charged, new section 938 simply stated, "If [the Family Court] decides that [the child] is not amenable, it shall refer the child to the Superior Court or to any other court having jurisdiction over the offense for trial as an adult."

The question thus becomes whether the Legislature's repeal in 1971 of 11 *Del. C.* § 2712 has substantive significance or simply represents a ministerial or "housekeeping" act to repeal a statutory provision rendered redundant by the 1971 legislation transferring § 2711 to § 938(c) of Title 10.[9] The Legislature clearly did not disturb the amenability process beyond transferring the concept from 11 *Del. C.* § 2711 to 10 *Del. C.* § 938. Therefore, we see no reason to assume that the Legislature's repeal of section 2712 was intended to diminish the

---

**9.** The parties, in their statutory analysis of the Delaware legislative scheme, do not discuss the

consequences of the 1971 legislation's repeal of 11 *Del. C.* §§ 2711 and 2712.

jurisdictional finality of a transfer of a child from Family Court's jurisdiction to Superior Court's.

Indeed, we think the contrary conclusion is compelled by the Legislature's simultaneous grant to Superior Court under section 921 of jurisdiction to sentence a child found guilty of any lesser crime than that originally charged. We conclude that the Legislature's reason for repeal of section 2712 of Title 11 was that section 2712 was rendered redundant by the power conferred upon Superior Court under section 921. The Legislature's express grant under section 921(2)b to Superior Court of jurisdiction to sentence for any lesser included crimes directly accomplished precisely what section 2712 did indirectly.

The Legislature's later, but nearly concurrent, enactment in 1971 of 58 *Del.Laws*, c. 116, reinforces the conclusion that the Legislature's conference of lesser included sentencing jurisdiction on Superior Court by section 921(2) encompassed *all* lesser included crimes of children over whom Superior Court acquired jurisdiction, either directly or indirectly. By the 1971 enactment, the General Assembly wrote into section 921 of Title 10 two exceptions to Family Court's exclusive *original* jurisdiction over children: (1) children charged with murder in the first degree, rape, and kidnapping; and (2) children sixteen years of age or over charged with violation of chapter 41 of Title 21, or any other crime over which the General Assembly "has granted or may grant jurisdiction to another court," which were included under § 921*(b)(1)*. The Legislature then wrote into § 921(b)(2) the amenability procedures for Family Court's discretionary jurisdiction to refer children sixteen or over found nonamenable to Superior Court for prosecution as adults. Most significantly, the Legislature then included within section 921(b) Superior Court's conferred lesser included sentencing jurisdiction over a child subject either to its exclusive jurisdiction under section 921(b)(1) or its derivative jurisdiction under section 921(b)(2), by providing:

> Superior Court shall retain jurisdiction for purposes of sentencing if any judge or jury shall find the child guilty of a lesser included crime following a trial *of one of the crimes specifically defined in this subsection or any crime in the case where the child has been transferred to the Superior Court by the Family Court pursuant to § 938 hereof.*

58 *Del.Laws*, c. 116 § 1 (emphasis added).

Thus, within the originally carefully crafted section 921(b) was placed Superior Court's lesser included sentencing authority, which thereby applied to both crimes defined under (b)(1) and those defined under (b)(2). We think it fairly clear from the juxtaposition of these subsections that Superior Court's retained jurisdiction to sentence a child for any lesser found crime was thus intended to apply equally to children over whom Superior Court was granted exclusive jurisdiction under section 921(b)(1) as to those children over whom Superior Court's jurisdiction was derivative for crimes defined under (b)(2). The court's lesser included sentencing jurisdiction extended to any "one of the crimes specifically defined" within subsection 921(b)(1) or (2).

Section 921(2)b of Title 10, as presently written, may therefore only reasonably be construed as extending Superior Court's retained sentencing jurisdiction for lesser included offenses to *all* offenses within that court's conferred jurisdiction; that is, both its originally conferred exclusive criminal jurisdiction over children charged with the most serious criminal offenses defined under present section 921(2)*a*, and its derivative jurisdiction over children sixteen or over charged with present section 921(2)*b* offenses and found by Family Court to be nonamenable. *Slater v. State*, Del.Supr., 606 A.2d 1334 (1992). The word "subsection" originally found in 58 *Del.Laws*, c. 116, encompassed crimes committed by children over whom Superior Court had exclusive jurisdiction and as to whom Family Court was without jurisdiction. The fact that the Code Revisors later saw fit to redesignate (b)(1) of section 921 as "(2)a," and to redesignate (b)(2), as well as the third unnumbered paragraph (conferring Superior Court's re-

tained sentencing jurisdiction), as "(2)b" is not evidence of legislative intent to the contrary.

Further, to accept defendant's construction of the limited meaning of the term "subsection," so as to confine Superior Court's lesser included sentencing authority to its derivative jurisdiction (over offenses of children sixteen or over found to be nonamenable by Family Court), would also render redundant the remaining clause of that section, "or any crime in the case where the child has been transferred to the Superior Court by the Family Court pursuant to § 938 hereof." Clearly, the quoted clause refers to crimes within Superior Court's derivative jurisdiction, whereas the preceding clause refers to crimes within Superior Court's original jurisdiction. Thus, we agree with the State that to reach any other construction of present § 921(2)b would lead to an absurd result, which we cannot find to have been intended by the Legislature. We are not persuaded by defendant's underlying thesis that the Legislature, by limiting Family Court's authority to apply the amenability process to children sixteen years of age or over, intended to divest Superior Court of its previously conferred original jurisdiction to convict and sentence Marine as an adult for the lesser included crime of murder in the second degree, to which a Superior Court jury found him guilty. *Slater*, 606 A.2d at 1337. *See Brooks v. Taylor*, Del.Supr., 154 A.2d 386, 392 (1959) (Family Court is "a court of limited—not general—jurisdiction").

Therefore, we reject Marine's contention that Superior Court's retained jurisdiction to sentence for lesser included offenses was intended by the Legislature to be limited to children subject to Superior Court's derivative jurisdiction for crimes defined under section 921(b)(2), now denominated as section 921(2)b. The Delaware statutory scheme must be read as conferring on Superior Court lesser included sentencing jurisdiction over all children charged with any crimes now defined under 10 *Del. C.* § 921(2), including murder in the first degree. *Slater*, 606 A.2d at 1337.

## III

■■■ We take up the third issue raised on appeal, as to which this Court, by Order dated May 22, 1991, directed supplemental briefing:

Assuming a found legislative intent to confer on Superior Court jurisdiction to sentence Marine as an adult for the lesser included crime of murder in the second degree, does the Delaware statutory scheme thereby deny Marine either due process or equal protection?

Marine so contends because of his being under the age of sixteen when he was charged. Under the Delaware statutory scheme, a juvenile under sixteen charged with murder in the second degree is subject to Family Court's exclusive jurisdiction, and is to be proceeded against, pursuant to 10 *Del. C.* § 931, as a delinquent child and not as a criminal. Marine therefore argues that Superior Court's conferred lesser included sentencing jurisdiction denies him treatment equal to that of a child under sixteen who is guilty of the same crime, but who had been originally charged with murder in the second degree. The consequence, Marine contends, is that unless Superior Court is found to have been divested of its original jurisdiction over him upon the jury's return of a verdict of guilty of the lesser included offense of murder in the second degree, he will be subjected to much harsher punishment than others guilty of the identical offense. This cannot be rationally justified, he claims.

The State responds that under the Delaware legislative scheme age is only a qualifying factor that is relevant to the amenability process. The State asserts that Marine's claim of unequal treatment results only from Superior Court's exercise of its conferred lesser included sentencing jurisdiction, a "hardly unique" grant of authority. *See Self v. Blackburn*, 5th Cir., 751 F.2d 789 (1985) (describing Louisiana statute); *United States v. Bland*, D.C.Cir., 472 F.2d 1329, 1331 n. 7 (1972) (referring to similar provision in the District of Columbia Code). The State argues that the Delaware legislative distinction based on the seriousness of the offense and the "charg-

ing decision" does not violate due process or equal protection.[10]

The distinction drawn by the statutory scheme, based on the crime with which a defendant is charged, is not a suspect classification, nor does it involve a fundamental right.[11]

> In the area of equal protection especially, courts have traditionally afforded legislative classifications a presumption of reasonableness and constitutionality where discrimination is not based upon race, color, religion, ancestry, or other "inherently suspect" classification requiring a more "strict scrutiny"....

*Justice v. Gatchell,* Del.Supr., 325 A.2d 97, 102 (1974). This Court's standard of review of a statutory scheme challenged on due process or equal protection grounds not involving a suspect class or fundamental right is universal and well settled.

> In determining whether a statutory classification, not involving a suspect class or fundamental right, violates the equal protection clause, we presume that the distinctions so created are valid. "A statutory discrimination or classification will not be set aside if any state of facts reasonably may be conceived to justify it."

*Traylor v. State,* Del.Supr., 458 A.2d 1170, 1177 (1983) (citation omitted). In *Mills v. State,* Del.Supr., 256 A.2d 752 (1969), this Court also recognized that equal protection does not mandate identical treatment for all persons, but rather that in the event of distinctive treatment for persons within a class, there be a reasonable basis for the distinction.

> Equal protection of the laws does not require that all persons be dealt with identically; it does require that a distinc-

tion must have some relevance to the purpose for which the classification is made [and that] there is reasonable basis for the distinction made.

*Id.* at 756 (citation omitted).

■ For a legislative distinction to be found so unreasonable as to be discriminatory and a denial of a right of equal protection, the distinction must be found to be "patently arbitrary" and to bear "no rational relationship to a legitimate governmental interest." *Gotleib v. State,* Del.Supr., 406 A.2d 270, 275 (1979).

This Court has spoken generally on the question of whether a "direction to charge [juveniles] as adults is a violation of the Equal Protection Clause of the Fourteenth Amendment of the Federal Constitution." In *State v. Ayers,* Del.Supr., 260 A.2d 162 (1969), we stated:

> It is no novelty in our law to require that for certain crimes juveniles shall be tried as adults in the Superior Court. At the present time, juvenile offenders can be tried in the Superior Court for murder in the first degree, rape, kidnapping, and for the possession or use of molotov cocktails.

> \* \* \* \* \* \*

> The matter, that of age classification for purposes of indictment and trial, has always been for the decision of the General Assembly, the policy-making branch of the State Government.

> The discretion of the General Assembly in setting policy under its police power is, however, not absolute. It may not be arbitrary or capricious; it must be reasonable. When the power is exercised to classify for purpose of trial for crimes, as this is, then the classification

---

10. The State relies largely on federal decisional law for sustaining the Delaware classification scheme as neither arbitrary or discriminatory and not a denial of due process or equal protection. *Woodard v. Wainwright,* 5th Cir., 556 F.2d 781 (1977); *Cox v. United States,* 4th Cir., 473 F.2d 334 (1973); *United States v. Bland,* D.C.Cir., 472 F.2d 1329 (1972); *United States v. Alexander,* D.D.C., 333 F.Supp. 1213 (1971).

11. Marine acknowledges the Legislature's "power to legislate in this area" consistent with due

process and equal protection. If the Legislature had explicitly declared that a child, regardless of age, should be proceeded against as an adult for murder in the second degree, or that a child under 16 and so charged would also be subject to Family Court's amenability processes, Marine concedes that he would have no claim to denial of equal protection. Thus, Marine concedes that his claim is not based on a denial of a fundamental right.

must be founded on differences reasonably related to the purposes of the statute in which the classification is made.

*Id.* at 170–71 (citations omitted). *See United States v. Alexander,* D.D.C., 333 F.Supp. 1213 (1971).[12]

The law is well settled that a legislative scheme vesting broad authority in the state or federal government through the charging process to determine whether a child shall be prosecuted as a juvenile or as an adult is not a denial of due process in the absence of "suspect" factors [race or religion] or other arbitrary classifications. *United States v. Bland,* D.C.Cir., 472 F.2d 1329, 1333–37 (1972). In *Albury v. State,* this Court stated:

> In our criminal justice system the State has broad discretion as to whom to prosecute. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision of whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."

Del.Supr., 551 A.2d 53, 61 (1988) (quoting *Wayte v. United States.* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547, 556 (1985)) (citations omitted). *See also United States v. Quinones,* 1st Cir., 516 F.2d 1309, 1311, *cert. denied,* 423 U.S. 852, 96 S.Ct. 97, 46 L.Ed.2d 76 (1975) (Congress can lawfully vest in the Attorney General discretion to decide whether to proceed against a juvenile as an adult, the exercise of which does not require a due process hearing or implicate the equal protection clause).

In *State v. J.K.,* Del.Supr., 383 A.2d 283 (1977), we found the underlying purpose of the Delaware statutory scheme to be to classify minors charged with violations of State law—for purposes of proceeding against either as juveniles or as adults—on the basis of the seriousness of the offense charged. There, we also rejected an indirect challenge on constitutional grounds to sections 937 and 938. We found "the classifications drawn by the amenability process to be reasonable, and [to] rest upon a basis of difference bearing a fair and substantial relation to legitimate goals." *Id.* at 289. Having found section 938 to be "constitutionally sound," we also found the distinctive treatment of juveniles within Family Court and Superior Court, depending upon the outcome of an amenability proceeding, neither arbitrary nor irrational and not a denial of equal protection. *Id.*

In *State v. Anderson,* Del.Super., 385 A.2d 738 (1978), the Superior Court conducted a "reverse amenability" proceeding under 10 *Del. C.* § 939(b) involving juveniles charged with rape in the first degree seeking transfer to Family Court for civil proceedings against them as delinquents. The court referred to Delaware's "two-tiered system of adjudication" as being premised on the age of the offender determining the place of adjudication, civil or criminal, except for those offenses enumerated under sections 921(2)a and 938(a)(1), for which the Legislature "preempts discretion and requires adjudication at the Superior Court level." *Id.* at 740.

Marine's claim of denial of equal protection in sentencing is flawed because it con-

---

**12.** At common law, a child under seven was "conclusively presumed incapable of committing any crime whatever"; and from age seven until age fourteen, the presumption, though not conclusive, continued but weakened "as the age advances toward fourteen," with the presumption overcome by evidence of intelligence and malice if "strong and clear beyond all reasonable doubt." *State v. George,* Del.Ct. Gen.Sess., 54 A. 745, 745 (1902). With a child fourteen years of age or over, the presumption was displaced, and the child was presumed "in point of understanding, capable of committing any crime, until the contrary be proved." *Id.* at 745–46 (quoting 3 Greenleaf on Evidence § 4). With the enactment by the Legislature of acts

establishing juvenile courts and setting forth their jurisdiction over children charged with non-capital crimes, the Legislature, acting pursuant to Del. Const., Art. IV, § 28, displaced the common law with respect to trying and convicting a child of a crime. *See Brooks v. Taylor,* Del.Supr., 154 A.2d 386, 389–90 (1959). The earliest such legislation dates from 1911, with the establishment of the Juvenile Court of the City of Wilmington by 26 *Del.Laws,* ch. 262, § 3; in 1933, the Juvenile Court of Kent and Sussex Counties was created by 38 *Del.Laws,* ch. 197; and in 1945, the first Family Court of Delaware was created by 45 *Del.Laws,* ch. 241. *Brooks,* 154 A.2d at 390–91. *See* II above.

fuses Delaware's allocation of exclusive original jurisdiction over a child charged with violation of state law on the seriousness of the offense *alone,* with Delaware's age classification for the purpose of limiting Family Court's jurisdiction to refer a child for prosecution as an adult on a finding of nonamenability. Thus, Marine erroneously relies on the age limitations imposed on Family Court's authority to find a child nonamenable to its processes as a basis for finding unequal treatment to result to him from Superior Court's clearly conferred lesser included sentencing jurisdiction.

Moreover, the Legislature's 1971 enactment of a reverse amenability process eliminates the potential for arbitrary or capricious charging decisions to result in unequal treatment. By section 939, either the Attorney General or the Superior Court may conclude that "the interests of justice would be best served" by a transfer of the child from Superior Court's jurisdiction, to prosecute the child as an adult, to Family Court's jurisdiction, to proceed civilly in the interest of the child. 58 *Del.Laws,* c. 116, now 10 *Del. C.* § 939.[13] The Legislature has thereby provided a judicial counterweight to any perceived prosecutorial charging excess. The Legislature has accorded a child in Marine's situation a right to seek transfer of the criminal charges against him from Superior Court to Family Court; and Marine exercised that right of recourse in a section 939 proceeding which we next review.

We find no merit in Marine's assertion that the Delaware statutory scheme denies Marine either due process or equal protection. Indeed, Marine has failed even to rebut the presumption of the reasonableness and constitutionality of the Delaware statutory scheme, in particular the Legislature's conference upon the Superior Court of lesser included sentencing jurisdiction over a juvenile found guilty of a lesser included offense. *See Bland,* 472 F.2d at 1333–37; *United States v. Donelson,* D.C.Cir., 695 F.2d 583 (1982); *Alexander,* 333 F.Supp. at 1213. We further find that the distinctions drawn by the statutory scheme are not patently arbitrary and do bear a rational relationship to legitimate governmental interests. *See Ayers,* 260 A.2d at 162; *Gotleib,* 406 A.2d at 270; *J.K.,* 383 A.2d at 283.

## IV

We now address Marine's contention that Superior Court abused its discretion in refusing to transfer Marine to Family Court following the reverse amenability proceeding and again following Marine's acquittal of murder in the first degree. 10 *Del. C.* § 939(b). This Court, by Order dated May 22, 1991, directed the parties to submit supplemental briefing on the following question:[14]

Whether Superior Court in its order of July 26, 1988 correctly applied 10 *Del.C.* § 939(b) in denying Marine's application for transfer of the case to Family Court. The parties are directed to consider rele-

---

**13.** 10 *Del. C.* § 939, "Transfer of Cases from Superior Court to Family Court," provides:

(a) In any case in which the Superior Court has jurisdiction over a child, the Attorney General may transfer the case to the Family Court for trial and disposition if, in his opinion, the interests of justice would be best served.

(b) Upon application of the defendant in any case where the Superior Court has original jurisdiction over a child, the Court may transfer the case to the Family Court for trial and disposition if, in the opinion of the Court, the interests of justice would be best served by such transfer. Before ordering any such transfer, the Superior Court may hold a hearing at which it may consider evidence as to the following factors and such other factors which, in the judgment of the Court are deemed relevant:

(1) The nature of the present offense and the extent and nature of the defendant's prior record, if any;

(2) The nature of past treatment and rehabilitative efforts and the nature of the defendant's response thereto, if any; and

(3) Whether the interests of society and the defendant would be best served by trial in the Family Court or in the Superior Court.

(c) In the event the case is transferred by the Superior Court under this section, the case shall proceed as if it had been initially brought in the Family Court, and the Family Court shall have jurisdiction of the case, anything to the contrary in this chapter notwithstanding.

**14.** This, and a related issue, were briefed, argued and taken under submission by this Court on October 29, 1991.

vant decisional law in Delaware and other jurisdictions, including *State v. Anderson*, Del.Super., 385 A.2d 738 (1978).

We summarize the relevant facts. On December 8, 1987, a Kent County grand jury returned an indictment charging Marine with murder in the first degree, in violation of 11 *Del.C.* § 636(a)(1). The indictment charged that Marine "did intentionally cause the death of Amanda Hemphill by beating her and then strangling her until her death." On or about April 5, 1988, Marine filed a motion in Superior Court "to conduct reverse amenability hearing," pursuant to 10 *Del.C.* § 939(b), for the purpose of determining whether the case should be transferred to the Family Court. The State opposed transfer. Beginning July 20, 1988, Superior Court conducted a three-day evidentiary hearing. By decision and order dated July 26, 1988, the court denied Marine's motion. Finding that Marine had not met his burden of overcoming "the presumption that a need exists for adult discipline and legal restraint," the court concluded that Marine's transfer to Family Court was "neither in the interests of society nor the defendant." [15]

---

**15.** We set forth in full the court's order dated July 26, 1988:

**ORDER**

This 26th day of July, 1988, upon consideration of defendant's application for transfer of this case to the Family Court, the evidence presented, and the record in this case, it appears that:

(1) Defendant Frederick Marine has been indicted by the Grand Jury on the charge of Murder in the First Degree, 11 *Del. C.* § 636(a)(1). At the time of the alleged offense, Marine was 14 years old, and the alleged victim, Amanda Hemphill, was 10 years old. The indictment alleges that Marine intentionally caused the death of the victim by beating her and then strangling her until her death. Marine has moved this Court to transfer his case to Family Court pursuant to 10 *Del.C.* § 939(b). The State opposes any transfer.

(2) The historical background of dispositions involving juvenile offenders has been stated in *State v. Boardman*, Del.Super., 267 A.2d 592 (1970):

Prior to the enactment of special status laws for juvenile offenders, juveniles were referred to the regular criminal court. The juvenile therefore has no special common law rights in regard to criminal jurisdiction and, if the legislature deems it reasonable to grant some special privilege to juveniles, it can generally do so on such terms and with such limitations as it deems fit.

*Id.* at 595. The legislature has provided that a juvenile alleged to have committed first-degree murder shall be proceeded against as an adult unless a transfer to Family Court is made by the Attorney General or the Superior Court. 10 *Del. C.* § 938(a)(1); 10 *Del.C.* § 939.

(3) When a juvenile seeks transfer to Family Court of a first-degree murder charge within the original jurisdiction of this Court, he must overcome the presumption that a need exists for adult discipline and legal restraint. *State v. Anderson*, Del.Super., 385 A.2d 738 (1978). Specifically, he must demonstrate that he belongs in the juvenile setting by showing his need and

amenability to the program of supervision, care, and rehabilitation which he would receive as a juvenile. *Compare Commonwealth v. Pyle*, 462 Pa. 613, 342 A.2d 101 (1975). Thus, this Court has denied transfer to Family Court of first-degree murder and arson charges when a juvenile fails to discharge his burden of proof. *State v. Penuel*, Del.Super., No. IS86–04–0020, 1987 WL 47843 Chandler, J. (Letter Opinion) (Feb. 23, 1987) (burden of proving no need for adult discipline or legal restraint not met due to seriousness of charges, surrounding circumstances, juvenile's propensities, and need for long-term therapeutic intervention). *See also Commonwealth v. Zoller*, Pa.Super., 498 A.2d 436 (1985) (transfer denied where no assurance could be given that juvenile's antisocial and aggressive behavior could be abated with treatment within maximum time available under juvenile-court jurisdiction).

(4) The Court has heard extensive testimony concerning the nature of the offense charged. I have also considered the absence of any prior delinquency adjudications, the evidence of defendant's background in and outside of school, and the expert opinions of two psychologists, Irwin Weintraub, Ph.D. and Elizabeth Kingsley, Ph.D. In Dr. Weintraub's view, the defendant has severe psychological problems. Although Dr. Weintraub found no mental illness, he finds that Marine has such inability to exercise self-control under stress that intensive inpatient psychotherapy is required for an indefinite period. He cannot say how much improvement there will be from this treatment or when it will occur. It is his opinion that, at the time of the victim's death, Marine could not control his behavior. Dr. Kingsley also believes that intensive psychotherapy is needed. She also cannot say how effective this treatment will be by the time the defendant reaches his majority.

(5) After careful consideration of the nature of the alleged offense, the surrounding circumstances, the defendant's background, and the expert testimony, the Court is not persuaded that no need exists for adult discipline and legal restraint. Defense counsel's contention that the

The parties disagree as to our standard and scope of review. Defendant asserts that we review the trial court's failure to remand under section 939(b) for abuse of discretion, while the State contends our standard and scope of review is one of plain error due to defendant's failure to timely raise this issue on appeal. *See Younger v. State*, Del.Supr., 580 A.2d 552 (1990). Addressing the threshold issue of waiver, we conclude that the interests of justice require us to address the merits. The question was fairly presented to the trial court and defendant's failure to address the issue in either his opening or his first supplemental brief does not, under the circumstances of this case, preclude addressing the issue on its merits. *See Marine v. State*, Del.Supr., No. 180, 1989, Horsey, J. (May 22, 1991) (ORDER). An issue involving a court's subject matter jurisdiction, here timely raised below, will not be deemed to be waived. *Cane v. State*, Del.Supr., 560 A.2d 1063 (1989); *Wainwright v. State*, Del.Supr., 504 A.2d 1096 (1986); *Sergeson v. Delaware Trust Co.*, Del.Supr., 413 A.2d 880 (1980).

Marine asserts two claims: first, that the trial court abused its discretion under section 939(b) in refusing to remand Marine to Family Court immediately after the reverse amenability hearing; and second, that the trial court erred as a matter of law in failing to remand Marine to Family Court after his trial in Superior Court upon the jury's finding that Marine was not guilty of murder in the first degree.

However, because we find an analytically prior error of law in the court's order dated July 26, 1988, denying Marine's request for transfer to Family Court, we do not reach these claims as denominated.

The relevant statutory provision, 10 *Del.C.* § 939, lists three factors which may, *inter alia*, be considered by the court as relevant to transfer:

(1) The nature of the present offense and the extent and nature of the defendant's prior record, if any;

(2) The nature of past treatment and rehabilitative efforts and the nature of the defendant's response thereto, if any; and

(3) Whether the interests of society and the defendant would be best served by trial in the Family Court or in the Superior Court.

In *State v. Anderson*, Del.Super., 385 A.2d 738 (1978), the court transferred the several juvenile defendants to Family Court following a reverse amenability hearing. The court held that "the inquiry mandated by section 939(b)(1) [i.e., 'the nature of the present offense'] is not limited to consideration of the type of offense but permits a weighing of the circumstances which surround the acts charged." *Id.* at 740. The Superior Court examined the evidence as then available and concluded that "given the infirmities in the State's case, there is no assurance that any defendant will be convicted in this Court...." *Id.* at 741. Finally, the Superior Court found that "[t]he mitigating aspects of the offense and the weakness of identity [16] incline the [Superior] Court to a transfer of jurisdiction." *Id.*

Following *Anderson*, we construe the "nature of the present offense" provision of section 939 as requiring that Superior Court consider whether the State can establish a *prima facie* case against the defendant. We therefore hold that section 939 requires Superior Court to conduct an

State cannot prove murder in the first degree beyond a reasonable doubt misconstrues the nature of the Court's present inquiry. This is not a trial on the merits. The ultimate issue of guilt or innocence is for the jury to decide. The Court's focus at this stage is upon the need for adult discipline and legal restraint. No assurance has been given that the defendant's antisocial and aggressive behavior can be abated with treatment within the maximum available Family Court jurisdiction. *See* 31 *Del.C.* § 5109.

The Court is satisfied that transfer to Family Court is neither in the interests of society nor the defendant.
*State v. Frederick Marine*, Del.Super., No. IK87–12–0847, 1988 WL 91072 Ridgely, J. (July 26, 1988) (ORDER).

16. *Anderson* involved nine juvenile defendants each charged with two counts of Rape First Degree. 385 A.2d at 739. The State relied solely on the testimony of codefendants to establish identity. *Id.* at 741.

investigation akin to a "proof positive" hearing.[17] We find the proof positive hearing to have a purpose analogous to the reverse amenability hearing. A proof positive hearing also involves a situation where important rights are determined by the degree of the capital offense charged. A defendant charged with murder in less than the first degree is constitutionally entitled to bail. Similarly, a juvenile defendant charged with murder in less than the first degree is statutorily entitled to Family Court proceedings in his interest. In each situation, a judicial examination of the evidentiary justification for the charging decision is required. *See In re Steigler*, Del. Supr., 250 A.2d 379, 383 (1969).

 In this case, the Superior Court stated, "After careful consideration of the nature of the alleged offense, the surrounding circumstances, ... the [Superior] Court is not persuaded that no need exists for adult discipline." However, the Superior Court made no findings of fact relative to the nature of the offense. Moreover, the Superior Court rejected defendant's attempt to assert that the State had insufficient evidence to prove murder in the first degree: "Defense counsel's contention that the State cannot prove murder in the first degree beyond a reasonable doubt misconstrues the nature of the Court's present inquiry. This is not a trial on the merits."

While the Superior Court was correct that guilt or innocence must ultimately be determined following trial by the finder of fact, the Superior Court erred in summarily rejecting Marine's assertion that the State could not prove its case, and in failing to make factual findings in that regard. *Anderson*, 385 A.2d at 741; 10 *Del. C.* § 939(b)(1). The trial court focused exclusively on the factors contained in section 939(b)(2) and (3), while failing to make any specific findings as to section 939(b)(1). This was error.

## V

Having found Superior Court to have erred in its application of 10 *Del. C.* § 939(b), we do not reach the correctness of its result. We conclude that we must vacate the judgment of Superior Court following its faulty reverse amenability hearing and remand to Superior Court, with jurisdiction retained, to grant Marine the reverse amenability hearing he was entitled to. At this hearing, Superior Court will give appropriate consideration to the nature and circumstances of the offense charged in accordance with the principles of *State v. Anderson*, Del.Super., 385 A.2d 738 (1978). However, except for good cause shown, the Superior Court's reconsideration of the matter should be limited to the record made before trial and at the first hearing. On return from remand, we will review Superior Court's exercise of its discretion following an appropriate reverse amenability hearing and determine whether to reinstate Marine's conviction and sentence, or to transfer Marine to the Family Court, in the interests of justice, "for trial and disposition." 10 *Del.C.* § 939(b); 937. Principles of double jeopardy do not attach. *See State v. Wilson*, Del.Supr., 545 A.2d 1178 (1988); *Bailey v. State*, Del.Supr., 521 A.2d 1069, 1075 (1987).

\*　　\*　　\*

Remanded, with jurisdiction retained, pursuant to Supreme Court Rule 19(c).

---

**17.** Pursuant to constitutional and statutory provisions, capital defendants are entitled to require the State to show "proof positive or presumption great" in order to be denied bail. *Del. Const.*, Art. I § 12; 11 *Del. C.* § 2103. In such a hearing, Superior Court is to "avoid even the appearance of a determination of ultimate guilt or innocence." *In re Steigler*, Del.Supr., 250 A.2d 379, 383 (1969). However, the defendant will be entitled to bail if the court "in its discretion concludes from the evidence that the State does not have a fair likelihood of convicting the accused of the capital offense." *Id.*