The STATE of Delaware

v.

**James W. MAYHALL, and Joshua C. Holder, Defendants.**

Crim. A. Nos. IK94–09–0110–0111, IK94–09–0118–0119.

Superior Court of Delaware, Kent County.

Submitted: Feb. 21, 1995.
Decided: March 16, 1995.

James V. Apostolico, and Daniel Miller, Deputy Attys. Gen., Dept. of Justice, Dover, for the State.

David Jones, Blades, Pryor & Benson, Dover, for defendant Mayhall.

Andre M. Beauregard, Brown, Shiels & Chasanov, Dover, for defendant Holder.

## OPINION

TERRY, Resident Judge.

James Mayhall and Joshua Holder were charged with Murder in the Second Degree in connection with the beating death of Michael Keesser on August 18, 1994. Both defendants were 16 years old at that time. An indictment was returned in the Superior Court pursuant to 10 *Del.C.* § 1010 which provides that a child shall be proceeded against as an adult when charged with Murder in the Second Degree. Both defendants moved to have the case transferred to Family Court under the provisions of 10 *Del.C.* § 1011 which allows the Court to conduct a reverse amenability hearing to determine whether the defendants are more amenable to the processes of this Court or the Family Court[1]. After a hearing which lasted two weeks, I am required by statute to consider as to each defendant, among other things, the following:

1. The nature of the present offense and the extent and nature of the defendant's prior record, if any;

2. The nature of past treatment and rehabilitative efforts and the nature of the defendant's response thereto, if any; and

3. Whether the interests of society and the defendant would be best served by trial in the Family Court or in the Superior Court. 10 *Del.C.* § 1011.

NATURE OF THE PRESENT OFFENSE AND THE EXTENT AND NATURE OF THE DEFENDANTS' PRIOR RECORD.

The Delaware Supreme Court has recently clarified the legal standard to be applied to this section of the statute. Drawing on *State v. Anderson,* Del.Supr., 385 A.2d 738 (1978) it held that the Superior Court must consider whether the State can establish a prima facie case against the defendant and that a hearing must be conducted akin to a proof positive hearing. *Marine v. State,* Del.Supr., 607 A.2d 1185, 1211 (1992), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 28, 120 L.Ed.2d 952 (1992) (Marine I). In its prior decision captioned *In re Steigler,* Del.Supr., 250 A.2d 379 (1969) the Supreme Court noted that at a proof positive hearing the Superior Court is to "avoid even the appearance of a determination of ultimate guilt or innocence" and that the applicable standard is whether the State has "a fair likelihood of convicting the accused."

When the Superior Court reconsidered the Marine case on remand it concluded that the term "prima facie case" as used in the context of a reverse amenability hearing meant something more than whether some credible evidence exists tending to prove each element of the offense charged, and it held that once the State has come forward with proof positive evidence, the burden shifts to the defendant to convince the Court that the State does not have a fair likelihood of convicting the defendant. The Superior Court further held that the evidence must be viewed in its totality and that a prima facie case is not established if the evidence does not establish a fair likelihood of conviction. *State v. Marine,* Del.Super., Cr.A. No. IK87–12–0847, 1992 WL 301993, Ridgely, P.J. (September 29, 1992), mem. op. at 13.

On appeal the Delaware Supreme Court affirmed the Superior Court and stated that "a prima facie case of murder in the first degree is not established if there is not a fair likelihood of Marine's being convicted on that charge." *Marine v. State,* Del.Supr., 624 A.2d 1181, 1185 (1993) ("Marine II"). However, elsewhere in its opinion the Court said

---

1. 10 *Del.C.* § 1010 and 1011 were formerly 10 *Del.C.* §§ 938 and 939 respectively.

that "in the context of a reverse amenability hearing, the issue is whether the evidence in its totality (prosecution and defense) demonstrates prima facie, that the State has a substantial likelihood of convicting the accused juvenile as charged." *Id.* at 1185.

In the case at bar, the State says that the standard is "fair likelihood" and defines it as a "legitimate possibility" that a jury could reasonably convict the defendant. Defendant Holder says that a fair likelihood of conviction would be one which "under all the circumstances is honest, reasonable and free from suspicion which is something less than a certainty that all the elements of the offense have been proven beyond a reasonable doubt." Finally, the defendant Mayhall says that the State must prove a "substantial likelihood" of conviction.

According to *Black's Law Dictionary* "prima facie" means:

At first sight; on the first appearance; on the face of it; so far as can be judged from the first disclosure; presumably; a fact presumed to be true unless disproved by some evidence to the contrary.

Turning to "fair likelihood of conviction" I have considered dictionary definitions as well as the ordinarily accepted meaning of the words used in the phrase "fair likelihood of conviction" (as opposed to other possible phrases such as "some likelihood" or "strong likelihood") and I am of the opinion that in Marine II the Court used "fair" and "substantial" interchangeably as having the same meaning when juxtaposed against the word "likelihood". One of the definitions of "substantial" found in *The Random House Dictionary of The English Language,* 2.ed is "of real worth, value, or effect." This definition connotes something of substance as opposed to something which is fanciful, speculative or illusory. The word also has a well settled meaning under the substantial evidence rule as being something that a reasonable mind might accept as adequate to support a conclusion. *See, e.g., Breeding v. Contractors–One–Inc.,* Del.Supr., 549 A.2d 1102, 1104 (1988). The *Random House Dictionary* defines "likelihood" as "the state of being likely or probable."

■ Thus, I believe that the fair likelihood standard is to be applied in this way: after reviewing the totality of the evidence presented, does it appear so far as can be judged from it, knowing that the defense has yet to be presented, that the likelihood of a conviction is real if the defense does not sufficiently rebut the State's evidence. A real probability must exist that a reasonable jury could convict on the totality of the evidence assuming that the evidence adduced at the reverse amenability hearing stands unrebutted by the defendant at trial.

■ The next step is to decide whether from the evidence brought out at the reverse amenability hearing there is a fair likelihood that a jury could convict the defendants of second degree murder, keeping in mind that my role is not to decide what the facts are or to opine as to the guilt or innocence of the defendants, and further keeping in mind that the defendants have not yet put on their defenses. My role, rather, is to look at the totality of the limited evidence and to decide whether it establishes a fair likelihood of conviction if not rebutted by the defendants.

Briefly, there was a birthday party at a house which lasted for many hours during which time a lot of drinking occurred and a number of guests came and went. Later in the evening four young men who did not know most of the other guests arrived, and shortly thereafter an altercation broke out inside the house which quickly spilled out into the yard and driveway area between the house and the one next door. Once outside, the four recent arrivals were brutally attacked by varying numbers of people and were beaten around their heads and bodies to the extent that all four were knocked down. The victim in this case was beaten and kicked on his head and torso and died at the scene.

Both Holder and Mayhall were at the party and admittedly participated in some of the beatings but both of them deny that they participated in the beating of the victim. Several witnesses gave statements to the effect that Mayhall was punching the victim in the face and two police officers claim that Mayhall stated at the police station that he beat and kicked the victim. Similarly the

police say that Mayhall told them that he saw Holder kicking and punching the victim and another witness gave a statement that he saw Holder kick the victim three times. Holder also gave a statement to the police that he punched and kicked the victim. Both Mayhall and Holder deny that they participated in the victim's beating and say that any statements they gave which might create a contrary inference are not accurate because at least four people were beaten and they were confused as to which one was the victim. Furthermore, the neighbor saw part of the beating which was administered to the victim and he says that Holder was not involved.

There was a lot of confusion that night with thirty or so people milling around while about six of them assaulted the four recent arrivals. However, when I consider all of the evidence, keeping in mind that the defense has not yet been presented, I find that based on what has been produced to date the State has a fair likelihood of proving that Mayhall and Holder participated in the beating which the victim sustained.

The second degree murder statute at 11 *Del.C.* § 635(1) provides:

A person is guilty of murder in the second degree when:

(1) He recklessly causes the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life;

Recklessly is defined at 11 *Del.C.* § 231(c) which reads:

he is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from his conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

The evidence shows that the victim sustained a savage beating by at least four individuals and that he did not fight back. He sustained numerous bruises to his head, arms and torso and upon autopsy was found to have internal deep muscle bruising. The medical examiner testified that the injuries to his head, arms and knees showed a pattern suggesting that during part of the attack he was sitting or kneeling on the ground in a defensive posture trying to cover his head. The State has a fair likelihood of proving that the people who participated in the assault acted recklessly.

The statute also requires the State to prove that the defendants caused the victim's death under circumstances which manifest a cruel, wicked and depraved indifference to human life.

Considering the evidence just discussed and adding to it the medical examiner's testimony that blood from the victim's ruptured spleen either caused him to bleed to death or he choked to death on the blood coming from injuries to his mouth, it is obvious that the attack can be described as brutal and that it continued after the victim who had apparently never defended himself became defenseless. The medical examiner testified that some of the blows were very forceful and that she had only seen two such injuries in her career resulting from a car accident and a boxing match. The neighbor likened the attackers to a pack of angry dogs.

I find that there is a fair likelihood that the State can prove that those who beat the victim acted under circumstances which manifested a cruel, wicked and depraved indifference to human life.

▮ The defendants point to the fact that it is difficult to determine precisely what the fatal blow was and who struck it. However, if several people beat a person to death it is not necessary to isolate the person who struck the fatal blow because all of them could be equally guilty as participants. In determining when such liability is present, it has been stated that:

all persons who join together with a common intent and purpose to commit an unlawful act which, in itself, makes it not improbable that a crime not specifically agreed upon in advance might be committed, are responsible equally as principals for the commission of such incidental or consequential crime, whenever the second crime is one in furtherance of or in aid to the originally contemplated unlawful act.

*Delaware Criminal Code, With Commentary,* (1973), § 271, at 48 (1973), citing *State v. Winsett,* Del.Supr., 205 A.2d 510, 516 (1964).

■ Furthermore, guilt could be established in such a situation on an accomplice theory (11 *Del.C.* § 271) because a person can intend to facilitate a crime when the required mental state for the offense is recklessness. *Martin v. State,* Del.Supr., 433 A.2d 1025, (1981) and *Hooks v. State,* Del. Supr., 416 A.2d 189 (1980).

Thus, I conclude from a review of the totality of the evidence now before me that the State has established that it has a fair likelihood of convicting the defendants of murder in the second degree.

## DEFENDANTS' PRIOR RECORD

### A. James Mayhall

The testimony of the coordinator of the Intensive Learning Center ("ILC") and Mayhall's probation officer can be summarized as follows. He was convicted of disorderly conduct in 1990. Between September and December 1992 he incurred a variety of 13 disciplinary violations at Smyrna High School resulting in ten out of school suspensions. In an effort to give him a more structured learning environment with intensive daily supervision he was enrolled at the ILC in January 1993 which is a tightly supervised high school providing on the spot counseling as needed. Meanwhile he had been convicted of offensive touching in December 1992 but did well on probation receiving an early discharge in September 1993. While at ILC Mayhall engaged in instances of disorderly behavior; he threatened a teacher with a chair in January 1994 and he was written up in April 1994 for hitting another student. He received ten suspensions between November 1993 and May 1994 when he left the ILC program. He was again convicted of disorderly conduct May 18, 1994 and was placed on probation which was in effect at the time of the instant offense.

### B. Joshua Holder

Holder's probation officer testified that he was on probation for drug delivery charges at the time of the offense. Generally, he complied with the terms of his probation insofar as he kept his appointments and attended a drug program at Chrysalis, Inc. However, he tested positive for marijuana and he had a varied level of abstinence from drugs during probation. His therapist thought that he would be more amenable to inpatient treatment. Holder attended ILC between September 20, 1993 and March 9, 1994 during which time he was suspended twelve times for non-violent infractions. Since leaving ILC he has attended Groves Adult High School where his behavior has been satisfactory. He has some type of learning disability and a laid back personality which his probation officer believes is non-aggressive.

## WHETHER THE INTEREST OF SOCIETY AND THE DEFENDANTS WOULD BE BEST SERVED BY TRIAL IN THE FAMILY COURT OR IN THE SUPERIOR COURT

### A. James Mayhall

■ Mayhall was born November 17, 1977 and was sixteen years old at the time of the crime charged. The nature of the present offense with which he is charged is significant for the reason that it involves the savage beating of a defenseless victim as well as lesser injuries inflicted on three other persons. Past treatment and rehabilitation efforts in the Family Court and the school system have been without success. The evidence shows that Mayhall can respond to a structured environment to some extent but that when not closely supervised he tends to lose control of himself on frequent occasions. A detention center counselor from the Division of Youth Rehabilitation Services testified that if convicted, Mayhall would probably be sentenced to a secure facility such as Ferris, Glen Mills or Shelby School [2]. The

2. He testified that Glen Mills provides counseling, psychiatric care, schooling and other forms of education such as budgeting and cooking. Shelby houses chronic, hard offenders with violent tendencies. This program is available when other programs have failed. Ferris is a secured facility. He testified that it is overcrowded and

Glen Mills program would likely last 12 to 18 months and if sent to Shelby the program would likely last for 12 to 24 months. Ferris is a lock-down facility and after completing the program at either Glen Mills or Shelby he could thereafter be held at Ferris until he reached his twenty-first birthday under the extended jurisdiction statute (10 *Del.C.* § 928) which allows the Family Court to maintain jurisdiction over a juvenile until age 21. However, he also testified that in his experience, no juvenile has ever been held at a Level V incarceration until age 21 but rather at some point is released and put on probation under close supervision.

While Mayhall has not received all of the rehabilitation services available through Family Court, I must balance this fact with a consideration of the nature of the offense charged, Mayhall's prior record, his age, and the need for long-term rehabilitation and supervision, should he be convicted of second degree murder. I also take into consideration the fact that by including second degree murder in those offenses where original jurisdiction has been conferred on the Superior Court under 10 *Del.C.* § 1010 the legislature has created a rebuttable presumption that juveniles charged with that crime should be tried as adults and the burden of proof rests with each defendant to rebut that presumption. *State v. Wyszynski*, Del.Super., Cr.A. Nos. IK94–01–206 through IK94–01–0102, 1994 WL 234009, Steele, J. (May 5, 1994) (ORDER). During Mayhall's stay at the ILC where he was closely supervised, he demonstrated episodes of violent and aggressive behavior which he was apparently unable to control. I am not persuaded that confinement at a youth facility and supervision until he reaches 21 years of age will be sufficient to bring these tendencies under control. If he is convicted it would be in his best interest, not to mention the public's, that he be subject to close supervision well beyond his twenty-first birthday.

B. Joshua Holder.

Holder was born April 13, 1978 and was 16 years old at the time of the crime charged. Holder was on supervised proba-

tion for drug charges when the offense occurred. He appears to have complied fairly well with some of the terms of his probation but apparently continued to use drugs from time to time. He, too, attended ILC where he was suspended 12 times over an approximately six month period but he appears to be performing satisfactorily at Groves Adult High School. He does not have a background of aggressive behavior and might have some type of learning disability. He has not been given the benefit of the residential treatment programs available through the Family Court.

Nevertheless, I must consider the nature of the crime charged where the victim was brutally beaten to death and the fact that if Holder is convicted in Family Court he will probably be confined for not more than 24 months and will be released from court supervision in about four years since he is now nearly 17 year old. If Holder is convicted of second degree murder, I am persuaded that long-term rehabilitation and supervision is needed and that neither his interests nor the interests of society would be served if supervision were to end in four years.

### CONCLUSION

Having considered all of the factors set out in the statute which I have previously discussed, I find that both defendants are non-amenable to Family Court and that, if they are found guilty of second degree murder, they need extended adult correctional treatment, rehabilitation and supervision. Therefore, each defendant's motion for transfer of proceedings to the Family Court pursuant to 10 *Del.C.* § 1011 is **DENIED.**

does not provide as much counseling as the other programs.