**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

VIVIAN L. MEDINILLA
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DE 19801-3733
TELEPHONE (302) 255-0626

August 3, 2017

Brian J. Chapman, Esq.
Law Office of Brian J. Chapman
300 Creek View Road, Suite 103
Newark, DE 19711

Daniel McBride, Esq.
Department of Justice
Carvel State Building
820 North French Street
Wilmington, DE 19801

Re: ***State v. Jakevis Ellington***
***Case ID No.: 1701005777***

Dear Counsel:

This is the Court's decision on Jakevis Ellington ("Defendant")'s Motion to Transfer the Case to Family Court ("Motion"), filed on April 26, 2017.[1]  For the reasons stated below, Defendant's Motion is **GRANTED**.

Defendant was fourteen years old when he was charged by indictment on April 17, 2017.[2]  The charges are: Murder First Degree, Robbery First Degree, two counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"), and Conspiracy Second Degree.  The allegations stem from alleged conduct that occurred on January 9, 2017.  Defendant was arrested on January 10, 2017, and has been detained at the New Castle County Detention Center on these charges since that date.

---

[1] *State v. Ellington*, Crim. I.D. No. 1701005777, D.I. #4 (Del. Super. Apr. 26, 2017) [hereinafter Motion].

[2] Defendant's date of birth is June 27, 2002.  Motion at ¶ 3.

## Factual and Procedural Background

At the reverse amenability hearing on July 6, 2017, Detective Mackenzie Kirlin testified on behalf of the State and stated that, on January 9, 2017, police responded to a homicide and robbery scene at a corner store located at 101 North Clayton Street in Wilmington, Delaware. Police found the store clerk dead from an apparent gunshot wound. Change was strewn about the store floor and countertop, suggestive of a robbery.

On January 10, 2017, Defendant's co-defendant, Devonte Dorsett ("Dorsett"), was arrested in relation to the above incident. At the time of his arrest, he was carrying a firearm that was later linked with ballistics evidence recovered at the crime scene.

Dorsett was interviewed at the Wilmington Police Department and described his version of the events on January 9, 2017. He told police that, on that date, he was present at his friends' residence located at 204 North Clayton Street. Defendant was also at the residence, visiting another person who lived at this address. Dorsett stated that it was Defendant's idea to rob the corner store. Dorsett responded that he wanted to rob a nearby "7-11" store. Nevertheless, the two traveled together to rob the corner store on Clayton Street.

Dorsett further admitted to possessing the gun and explained that Defendant did not carry the firearm at any time during the robbery. As the two entered the store, Dorsett stated that he displayed the firearm and demanded that the clerk open the cash register. Dorsett then told Defendant to pillage the cash register for money.

As Defendant retrieved the money from the cash register, Dorsett and the clerk began to "tussle" with one another. Defendant jumped the countertop to leave and dropped change in the process. Dorsett yelled at him to pick up the money. Defendant refused and fled the store. As Defendant fled, Dorsett claims he accidentally discharged his gun, striking the clerk. He ran from the store and stated that he only found out online the next day that the clerk had died from the gunshot wound.

After Dorsett's interview, he identified Defendant from a photo. Defendant was arrested that same day and interviewed at the Wilmington Police Department. Defendant described a somewhat different version of the robbery.

Defendant stated that he was at the residence on Clayton Street when Dorsett

2

grabbed him and took him to the basement of the residence. Dorsett was high on drugs and alcohol.[3] He showed Defendant the gun and told him that they were going to rob the corner store. Dorsett told Defendant that he would shoot him if he did not agree to assist in the robbery. Defendant complied.

According to Defendant's version, they entered the store and Dorsett drew his gun. Pointing the gun at Defendant, Dorsett told him to grab the money from the cash register. The "tussle" occurred when Dorsett blocked the doorway and prevented the clerk from escaping the store. Defendant explained that he left the store after refusing to pick up the change on the ground. He heard a shot while outside the store. He fled the scene.

After fleeing the store, he returned to the Clayton Street residence. There, he encountered Dorsett again. Defendant impressed upon someone at the residence to tell Dorsett to leave the residence. One of the residents instructed Dorsett to leave and he did.

Defendant moved to transfer his case to Family Court on April 26, 2017. A reverse amenability hearing was held on July 6, 2017. At the hearing, the State called two witnesses: Det. Kirlin and Jennifer Skinner, Master Family Service Specialist for the New Castle County Detention Center.

Additionally, the parties stipulated to the introduction of three reports: one from Robin Belcher-Timme, Psy.D.; a second report from Taunya Batista, M.A.; and a third from Ms. Skinner on behalf of the Department of Services for Children, Youth and Their Families, Division of Youth Rehabilitative Services ("YRS"). After considering the parties' submissions, arguments, and the testimony during the reverse amenability hearing, this is the Court's decision on Defendant's Motion.

### *Standard of Review*

The reverse amenability process is meant to identify those juveniles charged as adults who are amenable to the rehabilitative processes of the Family Court.[4] If the juvenile files a motion to transfer the adult charges, this Court must hold a reverse

---

[3] Dorsett also admitted during his interview that he was under the influence of alcohol and drugs on January 9, 2017.

[4] *See generally* 10 *Del. C.* §§ 1010-11 (2013 & Supp. 2016). *See Hughes v. State*, 653 A.2d 241, 249 (Del. 1994) (quoting *Marine v. State*, 624 A.2d 1181, 1184 (Del. 1993); *Marine v. State*, 607 A.2d 1185, 1209 (Del. 1992)).

amenability hearing and weigh the four factors set forth in 10 *Del. C.* § 1011(b).[5]

Under § 1011(b), the Court may consider evidence of: (1) "[t]he nature of the present offense and the extent and nature of the defendant's prior record, if any;" (2) "[t]he nature of past treatment and rehabilitative efforts and the nature of the defendant's response thereto, if any;" (3) "[w]hether the interests of society and the defendant would be best served by trial in the Family Court or in the Superior Court;" and (4) any "other factors which, in the judgment of the Court are deemed relevant."[6]

Before the Court weighs these factors, however, "the Court must preliminarily determine whether the State has made out a *prima facie* case against the juvenile, meaning whether there is a fair likelihood that [the defendant] will be convicted of the crimes charged."[7] There is a fair likelihood that the defendant will be convicted if, after reviewing the totality of the evidence presented, it appears that, if the defense does not sufficiently rebut the State's evidence, "the likelihood of a conviction is real. . . ."[8] Furthermore, "[a] real probability must exist that a reasonable jury could convict on the totality of the evidence assuming that the evidence adduced at the reverse amenability hearing stands unrebutted by the defendant at trial."[9]

### *Discussion*

As a preliminary comment, it should be noted that the State's argument against transfer included a contention that a shorter sentence in the juvenile justice system is simply "not enough" of a sanction for Defendant's alleged conduct. The General Assembly sets the statutory ranges for criminal offenses, including those for juvenile offenders. Abstract arguments about the appropriateness of a sentence miss the mark. The Court will not consider this argument. Instead, the Court focuses solely on the factors under § 1011(b).

Further, it is important to note what distinguishes this Motion from other motions to transfer regularly addressed by this Court. Defendant is charged with

---

[5] *See, e.g., State v. Harper*, 2014 WL 1303012, at *5-7 (Del. Super. Mar. 31, 2014).

[6] § 1011(b).

[7] *Harper*, 2014 WL 1303012, at *5 (citing *Marine*, 624 A.2d at 1185).

[8] *State v. Mayhall*, 659 A.2d 790, 792 (Del. Super. 1995).

[9] *Id.*

4

two counts of PFDCF. According to 11 *Del. C.* § 1447A(f): "Every person charged [with PFDCF] *over the age of 15 years* shall be tried as an adult, notwithstanding any contrary provisions or statutes governing the Family Court or any other state law."[10] Therefore, as a threshold matter, given Defendant's age of 14 at the time of the alleged offenses, the customary jurisdictional restrictions involving firearms charges are absent in this Motion. As such, the parties agree that the Court has discretion, under § 1011(b), to transfer all of the charged offenses against Defendant to Family Court.[11]

## I.      Likelihood of Conviction

The Court finds that there is a fair likelihood of Defendant's conviction at trial. In either version of the robbery, Defendant engaged in acts that, if proved at trial, would support a conviction for the charged offenses. Defendant's version of the robbery differs from Dorsett's; nevertheless, were the jury to hear Dorsett's version of the robbery, the jury could reasonably accept his version of the events and discount Defendant's version. In such a case, were Defendant unsuccessful in rebutting the State's case, there would exist a "real probability" of conviction.

Defendant argued that the Court should consider the affirmative defense of duress in this analysis. The State argued that this defense was immaterial to its burden to prove a *prima facie* case against Defendant. Even assuming, *arguendo,* that evidence of duress is raised at trial, this Court finds that there remains a fair likelihood that Defendant will be convicted of the charged offenses.[12] Though

---

[10] 11 *Del. C.* § 1447A(f) (2015 & Supp. 2016) (emphasis added).

[11] *See generally* 10 *Del. C.* § 541 (2013 & Supp. 2016) ("The Superior Court shall have such jurisdiction as the Constitution and laws of this State confer upon it."); § 922 (describing Family Court's exclusive and concurrent original criminal jurisdiction); § 1010 (describing procedures applicable to: "proceeding against child as an adult; amenability proceeding; referral to another court").

[12] Originally, this threshold analysis—the requirement that the State establish a *prima facie* case against the defendant at the reverse amenability hearing—derived from what is today the first prong of the § 1011(b): "nature of the present offense." *Marine v. State*, 607 A.2d 1185, 1211-12 (Del. 1992). This showing was analogized to a "proof positive" hearing. *Id.* "In each situation, a judicial examination of the evidentiary justification for the charging decision is required." *Id.* at 1212 (citing *In re Steigler*, 250 A.2d 379, 383 (Del. 1969)).
Though the statute has been amended on several occasions over the past 25 years, this requirement has endured. However, because this threshold analysis looks to the *charging* decision and its independent evidentiary basis, the viability of an anticipated affirmative defense, such as duress, is of questionable import.

Defendant reportedly participated in the offenses to a lesser extent than his co-defendant, at this point, there remains "[a] real probability . . . that a reasonable jury could convict [Defendant] on the totality of the evidence assuming that the evidence adduced at the reverse amenability hearing stands unrebutted" at trial.[13]

Thus, the State has met its burden of demonstrating a *prima facie* case against Defendant with a fair likelihood of conviction at trial.

## II.     Nature of Present Offense and Defendant's Prior Record

The Court now turns to an analysis of the four statutory factors outlined in § 1011(b). Preliminarily, the State concedes that three of the four factors to be considered weigh in favor of transfer. The State, however, argues that the nature of the present offense and society's interest suggest that the case should remain in Superior Court.

### A.     Nature of Present Offense

The first § 1011(b) factor is two-pronged.[14] The first prong of the first factor inquiries into the nature of the present offense. In this case, the severity of the charged offenses is patent. However, the charges distort Defendant's role in the underlying offenses. While Defendant actively assisted Dorsett in pillaging the cash register, Defendant was commanded to do so by his armed co-defendant, presumably the same person who threatened to shoot him if he did not help him commit the robbery. Further, Dorsett is several years older than Defendant. In other contexts, the United States Supreme Court has recognized the "mitigating qualities of youth," which includes a judicial and scientific recognition of the juvenile's proclivity to act impulsively and irresponsibly due to innumerable intrinsic and extrinsic factors.[15]

---

[13] *Mayhall*, 659 A.2d at 792.

[14] *See* § 1011(b)(1).

[15] *Miller v. Alabama*, 132 S.Ct. 2455, 2467 (2012) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). *Roper v. Simmons* and its progeny reflect the greater attention that is now placed on the peculiarities inherent in juvenile conduct. *See Roper v. Simmons*, 543 U.S. 551 (2005). *See also Montgomery v. Louisiana*, 136 S.Ct. 718 (2016); *Miller*, 132 S.Ct. 2455; *Graham v. Florida*, 560 U.S. 48 (2010). This Eight Amendment jurisprudence recognizes that juveniles possess a "lack of maturity and . . . underdeveloped sense of responsibility" that leads to reckless, impulsive, and heedless risk-taking. *Roper*, 543 U.S. at 569 (quoting *Johnson*, 509 U.S. at 367). They "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers. *Id.* (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). Juveniles have limited "control . . .

This Court considers Defendant's age and the nature and extent of his involvement in the "nature of the present offense" prong. Despite Defendant's potentially coerced involvement in the robbery, the Court finds that this prong of the first factor weighs against transfer.

B.    Defendant's Prior Record

Defendant has a minimal juvenile record.

To wit, the *State's* witness, Ms. Skinner, recommends that Defendant be found amenable to the rehabilitative processes of the Family Court.[16] Her report concludes with the following recommendation, on behalf of YRS: "Given [Defendant] has no prior adjudications or service history; and the fact that [the] Superior Court does not have exclusive jurisdiction over any of the charges based upon his age, []YRS recommends [Defendant] be found amenable and return to [the] Family Court."[17]

The Court finds that the second prong of this factor weighs in favor of transferring Defendant's case to Family Court.

## III.    Nature of Past Treatment and Defendant's Response

Defendant has a minimal past treatment history.

Ms. Skinner testified that the Division of Family Services ("DFS") did receive numerous calls regarding his mother's alleged neglect of Defendant and his siblings when Defendant was younger. The first six times DFS was called, the complaint was closed as: "unsubstantiated with concern." At some point, the situation

---

over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Id.* (citing Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 AM. PSYCHOLOGIST 1009, 1014 (2003)). And because a child's character is not as "well formed" as an adult's, his traits are "less fixed" and his actions are less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.* at 570 (citing ERIK H. ERIKSON, IDENTITY: YOUTH AND CRISIS (1968)).

[16] Report of Jennifer Skinner, Master Family Service Specialist, New Castle County Detention Center at 7 (submitted July 6, 2017).

[17] *Id.*

7

reportedly "stabilized."[18]

Dr. Robin Belcher-Timme's report corroborates the dysfunction of Defendant's upbringing.[19] Further, Dr. Belcher-Timme's report comprehensively chronicles: Defendant's educational history, including his status as an Individualized Education Program student since at least fifth grade; his frequent use of illicit substances at an early age; his psychiatric history, which contains undiagnosed references to Attention-Deficit Hyperactivity Disorder and Bipolar Disorder; and his legal history.

Dr. Belcher-Timme conducted a comprehensive clinical and risk assessment of Defendant. Paraphrasing the results of Dr. Belcher-Timme's findings, he found Defendant to be a "young man who has experienced a great deal of turmoil in his 15 years."[20] Defendant demonstrates "symptoms associated with trauma-related disorders. . . ."[21] He is categorized as a "moderate risk" for future violent conduct; however, "his risk for future violence can be substantially reduced" with a targeted treatment plan.[22] He has "never had any efforts at rehabilitation through the Family Court or [YRS]."[23] Dr. Belcher-Timme posits that Defendant has significant treatment needs; if treated, Defendant is likely to respond positively, augmenting Defendant's trajectory for the better.[24] Dr. Belcher-Timme opines that Defendant is "amenable to treatment and rehabilitation options available under the . . . Family Court and [YRS]."[25] No witnesses challenged Dr. Belcher-Timme's report.

If Defendant is convicted of the charged offenses in Family Court, he faces imprisonment and may benefit from approximately four years of treatment under the

---

[18] *See id.* at 2-6 (describing DFS involvement).

[19] *See generally* Robin Belcher-Timme, Psy.D., *Confidential Report of Psychological Evaluation* (July 3, 2017).

[20] *Id.* at 13.

[21] *Id.*

[22] *Id.*

[23] *Id.* at 14.

[24] *Id.*

[25] *Id.*

Family Court and YRS.[26] The testimony and reports submitted at the reverse amenability hearing support Defendant's minimal past treatment history.[27] These same reports suggest that Defendant is amenable to transfer and is likely to positively engage in future treatment. As such, the Court finds that this factor weighs in favor of transfer to the Family Court.

## IV. Interests of Society and Defendant

The State argues that the interests of society are best served by keeping the charges in this Court, in part, because of Defendant's prior child welfare history and the risk that, upon leaving the Family Court system, he would remain dependent/neglected and without parental supervision. Thus, the argument goes, Defendant would likely recidivate immediately into a criminal lifestyle. Instead, the State believes that a longer period of incarceration in adult prison is best in order to ensure the protection of society.

This Court disagrees and finds that the interests of society and Defendant would be best served by transfer to the Family Court. Placing a juvenile in adult prison, immersed with other adult offenders, and without the benefit of targeted rehabilitative services runs against the interests of society.

Moreover, every indication is that Defendant is amenable to the rehabilitative processes of the Family Court. His young age, lack of prior treatment, and his minimal juvenile history all suggest that transfer to the Family Court is appropriate. Though the nature of the charges is serious, all the other § 1011(b) factors point strongly in favor of transfer. So, too, do the interests of society and Defendant weigh heavily in favor of transfer to the Family Court.[28]

---

[26] Additionally, the Family Court may extend jurisdiction over Defendant until age twenty-one. *See* 10 *Del. C.* §§ 928-29 (2013 & Supp. 2016).

[27] Furthermore, the report of Taunya Batista, M.A., admitted at the reverse amenability hearing, suggests that Defendant is amenable to the rehabilitative processes of the Family Court. *See generally* Taunya J. Batista, M.A., *Amenability Report Prepared for: Jakevis Lamont Ellington* (July 3, 2017).

[28] The fourth factor of § 1011(b)—other relevant factors the Court deems relevant—has been sufficiently addressed in the other § 1011(b) factors such that the Court need not explicitly address this factor in its opinion.

## *Conclusion*

"[T]he interests of justice would be best served by" the transfer of Defendant's case to Family Court.[29] As such, for the reasons stated above, Defendant's Motion to Transfer the Case to Family Court is **GRANTED**.

**IT IS SO ORDERED**.

Sincerely,

Vivian L. Medinilla
Judge

oc:   Prothonotary
cc:   Defendant
       Investigative Service Office
       Jennifer Skinner, NCCDC

---

[29] § 1011(b).