# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | I.D. No. 2407012691 |
| | ) | |
| ANGELO RODRIGUEZ, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Submitted: January 7, 2025
Decided: February 11, 2025

*Upon Consideration of Defendant's Motion to Transfer Charges to Family Court,*
**DENIED.**

Julie Johnson, Esq., Deputy Attorney General, James Edward, Deputy Attorney General, Department of Justice, Georgetown, Delaware, *Attorneys for the State of Delaware.*

Patrick J. Collins, Esq., Collins, Price & Warner, 8 East 13th Street, Wilmington, Delaware, *Attorney for Defendant.*

**CONNER, J.**

## Introduction

Angelo Rodriguez ("Defendant") is charged with Murder First Degree, Assault First Degree, eight counts of Reckless Endangering First Degree, three counts of Possession of a Firearm During the Commission of a Felony, two counts of Possession of a Firearm by a Person Prohibited, and Theft of a Firearm in connection with a shooting that occurred on June 9, 2024, when defendant was approximately 14 years and 6 months of age.

A Reverse Amenability Hearing was held on December 9, 2024. Upon consideration of the parties' written submissions and evidence presented, Defendant's motion to transfer charges to Family Court is **DENIED**.

## Factual and Procedural History[1]

At approximately 4:24 p.m. a shooting was reported in the Town of Ellendale, Sussex County, Delaware. A 17 year old female shot in the upper torso was taken to the hospital by EMS and later died as a result of the shooting. A 17 year old male was taken to the hospital by private car and survived his gun shot wound.

The police learned through interviews and video evidence that two separate groups met in a field on North Old State Road to engage in a physical altercation. Soon thereafter shots were fired during the altercation. The Southern Grill

---

[1] This recitation is based upon written submissions and evidence presented at the reverse amenability hearing.

Restaurant located on West State Street and Main Street had video surveillance cameras in various locations. One of the cameras captured a group of approximately nine individuals walking from Willow Street to the location of the shooting. Another camera captured the shooting. Due to the distance of the camera location, the Defendant's face could not be clearly identified. However, he was identified by the clothes he was wearing.

Additional evidence includes events after the shooting. Defendant and others went to an address at 307 Willow Street, which is the home of Ebony Smack. In the home, the group gathered in Reginald McGlotten's bedroom. Reginald McGlotten is Ebony Smack's son. Davon Dallas pointed to the Defendant when Ebony Smack asked who brought a gun into the house.

When police arrived at 307 Willow Street homeowner Ebony Smack and Darryl Parker, Sr. were present. Ebony Smack told police that Defendant was in possession of a weapon which was secured until the police arrived. Darryl Parker, Sr. secured the Defendant and placed him in his car until the police arrived. AJ Mosley reported that when the group was discussing the shooting in Reginald McGlotten's bedroom, Defendant admitted to shooting the gun and fist pumped another participant after making the statement that he did the shooting.

There is discrepancy in reports to the police as to how the Defendant arrived at the altercation. Reginald McGlotten told police he picked the Defendant up before the fight on the side of the road. Others told police they picked the Defendant up at his house. However, each of the participants identified themselves in the video walking to the altercation. Defendant was dressed in all black and he was, again, identified as the shooter through his clothing.

When police arrived at 307 Willow Street, they recovered a gun. The gun was a 9 mm Metro Arms Dagger. The gun was reported stolen on May 19, 2024, from the home of Nicole Alvarez and Ray Rodriguez. Ray Rodriguez is Defendant's brother and the gun is registered to Nicole Alvarez, who is his fiancé. When the gun was stolen six (6) rounds of ammunition were also stolen. Ray Rodriguez told police the Defendant knew where the gun was and was present in the home before the gun was stolen. This is basis of the Theft of the Firearm charge and one count of the Possession of a Firearm by a Person Prohibited.

At the scene of the shooting three spent cartridges were found as well as one live round. A subsequent search located seven spent cartridges at the scene of the shooting. The bullet recovered from the autopsy revealed that it was fired from this gun. Upon further examination, the police were able to determine that more than three shoots were fired during the altercation. Ballistics evidence revealed that all of the casings were also fired from this gun.

3

The Defendant was tested for gun shot residue on his person. Although none was found, it was beyond the time frame of testing for gun shot residue on the skin. The police intended to test the Defendant's clothing for gun shot residue. However, the police mistakenly sent the jacket of Prince Mosley to the Pittsburgh lab for testing. Gun shot residue was discovered on the jacket.

The Defendant was indicted by the Sussex County Grand Jury on July 22, 2024. The Defendant was, again, approximately 14 years and 6 months old at the time of the alleged offenses.[2]

## Standard of Review

The reverse amenability process identifies juveniles charged as adults who are amenable to the rehabilitative process of the Family Court.[3] If a motion is filed to transfer the adult charges, this Court must hold a reverse amenability hearing.[4] First, the Court must determine whether the State has made out a *prima facie* case, or established a fair likelihood of conviction against the juvenile.[5] "A real probability must exist that a reasonable jury could convict the juvenile based on the totality of the evidence, assuming that the evidence introduced at the hearing is unrebutted by

---

[2] Defendant's date of birth is December 12, 2009
[3] *See generally* 10 *Del. C.* §§ 1010, 1011; *see also Hughes v. State*, 653 A.2d 241, 249 (Del. 1994).
[4] *State v. Harper*, 2014 WL 1303012, at *4 (Del. Super. Mar. 31, 2014).
[5] *Id.* at *5.

4

the juvenile at trial."[6]  The Court then weighs the factors set forth in 10 *Del. C.* §

1011(b).[7]  Since the Defendant was 14 at the time of the alleged offenses, the Court

need not consider the applicability of 11 *Del. C.* 1447A(d) as to the firearm charges.

**Discussion**

A. <u>Fair Likelihood of Conviction and Proof Positive Standards</u>

The State has established its *prima facie* case against Defendant as to the

charges other than the firearm charges as discussed previously.  The evidence shows

that the Defendant took the firearm from his brother's residence.  The firearm was

located at the residence at 307 Willow Street after the shooting.  Davon Dallas

indicated that it was the Defendant who brought the gun into the house after the

shooting.  AJ Mosley told police the Defendant admitted to shooting the gun during

the altercation and fist pumped another participant after he made the admission.

Lastly, the police were able to positively identify the Defendant through his clothing

as the person shooting across the street from the Southern Grill.  For these reasons,

---

[6] *Id.*

[7] The Court may consider evidence of: (1) "[t]he nature of the present offense and the extent and nature of the defendant's prior record, if any;" (2) "[t]he nature of past treatment and rehabilitative efforts and the nature of the defendant's response thereto, if any;" (3) [w]hether the interests of society and the defendant would be best served by trial in the Family Court or in the Superior Court[;]" and (4) any "other factors which, in the judgment of the Court are deemed relevant."

the State has met its burden demonstrating a *prima facie* case with the fair likelihood of conviction at trial. The Court will next consider factors for transfer.

B. <u>Weighing Section 1011(b)'s Four Factors</u>

Pursuant to 10 *Del. C.* § 1010(a)(5) state's "a child over the age of 12 and under the age of 16 may be proceeded against as an adult only when they are alleged to have committed murder in the first degree…."[8] "[The] legislature has created a rebuttable presumption that juveniles charged with that crime should be tried as adults and the burden of proof rests with each defendant to rebut that presumption."[9] Thus, "since a juvenile charged with a designated felony in the Superior Court has lost the benefit of Family Court adjudication by statutory pronouncement, there is a presumption that a need exists for adult discipline and legal restraint. Hence the burden is upon the juvenile to demonstrate the contrary."[10] The purpose of the Reverse Amenability process is to give juveniles charged as adults the opportunity to provide evidence to demonstrate that they are amenable to the rehabilitative process of Family Court.[11] This is accomplished by weighing the four factors set forth in 10 *Del. C.* § 1011(b) and any other factors which the Court deems relevant.

---

[8] 10 *Del. C.* § 1010(a)(5).
[9] *State v. Mayhall*, 659 A.2d 790, 795 (Del. Super. 1995).
[10] *State v. Harper*, 2014 WL 1303012, at *4 (Del. Super. March 31, 2014).
[11] *State v. Charles*, 2021 WL 3556780, at *2 (Del. Super. Aug. 6, 2021); see *Hughes v. State*, 653 A2d 241, 251 (Del. 1994).

1. *Section 1011(b) Factor One:  Nature of Present Offense and the Extent and Nature of Defendant's Prior Record*

The first § 1011(b) factor is two pronged.  The first prong looks at the nature of the present offense.  Defendant is facing multiple charges, with the most serious being Murder First Degree.  Defendant is also charged with Assault First Degree, multiple counts of Reckless Endangering First Degree, and multiple counts of firearm charges.  The Defendant is alleged to have fired multiple shots towards a group of people resulting in the death of one person and a second person being struck by a bullet.  The crimes are both violent and serious in nature.  The first prong of factor one weighs heavily against transfer.

The second prong evaluates the Defendant's prior record.  Defendant was first arrested on July 31, 2023 at the age of 13.  The police were investigating a hit and run accident involving a stolen car in the Tall Pines Mobile Home Park.  The police observed two occupants wearing black ski masks in the car.  A short time later, the defendant was located hiding in a nearby shed wearing a black ski mask.  The Defendant resisted arrest and was found with gloves and THC vape pens.

Defendant was interviewed again on August 1, 2023 by the police regarding another stolen vehicle.  His co-defendant told the police that the Defendant was driving the vehicle.  Defendant denied driving the vehicle in this incident.

7

On September 6, 2023, a person in the Plantation Roads, Lewes, Delaware area found a bookbag with two guns. The investigation revealed that the bookbag belonged to Zach Brooks. The father of Zach Brooks, Shane Brooks, told police that the bookbag was stolen from his sunroom. Fingerprints revealed that Defendant's fingerprints were located on the window leading into the sunroom. Shane Brooks told police his son and the Defendant used to be friends but stopped the friendship three to four months prior. The investigation also revealed that Defendant's Facebook page showed Defendant holding a firearm. Defendant was arrested for this burglary on September 26, 2023, when he was still 13.

Defendant's next criminal activity occurred September 24, 2023. The victim told police the Defendant requested a ride and asked to be picked up off Route 9. The victim and his girlfriend met the Defendant in a parking lot. The girlfriend moved from the front passenger seat to the left rear passenger seat. At this point, the Defendant sat in the front passenger seat. The Defendant's co-defendant sat in the right rear passenger seat. Defendant and co-defendant both pulled knives and demanded the victim's car and other items. The victim attempted to defend himself by pushing the knife away and cutting his hand. At this point the Defendant got out of the car and punched the victim breaking his glasses. The co-defendant also punched the victim at which point the Defendant and co-defendant took the car and drove away. During the incident, the defendants told the victim that they would kill

him. Also during the incident, the victims girlfriend told the Defendant she was 7 months pregnant and the co-defendant responded "then both will die". The co-defendant, Lewis Cameron, was an adult at the time of the incident and his charges are still pending.

As a result of Defendant's conduct between July 31, 2023 and September 24, 2023 the Defendant was adjudicated of Robbery in the Second Degree and Resisting Arrest. While on juvenile probation, the Defendant was arrested again on June 9, 2024 for Burglary Second Degree and Theft of a Firearm occurring May 18, 2024 for stealing the firearm from his brother's apartment. This incident was discussed previously.

The Defendant's priors, including firearms and armed robbery, cause the Court to determine that the second prong also weighs against transfer.

### 2. *Section 1011(b) Factor Two: Nature of Past Treatment and Defendant's Response*

Defendant was first involved with the Division of Youth Rehabilitative Services ("YRS") on September 26, 2023. After his arrest for the robbery case, the Defendant was securely detained at the Stevenson House Detention Center. While at Stevenson House, Defendant was involved in several fights and disobeyed a staff directive. On December 4, 2023, the Defendant was released with Pre-Trial

9

Supervision and GPS monitoring. A consultation and assessment (CAS evaluation) was also ordered.

On February 26, 2024, the Defendant was sentenced in Family Court to Community Supervision for a period of twelve months with GPS monitoring at YRS discretion. The Defendant was also ordered to follow the recommendations of the CAS evaluation. The Defendant's juvenile probation officer, Jessica Bryant, testified that she removed the GPS monitoring on March 14, 2024 because the Defendant was doing well and wanted to play sports. One week after removing the GPS monitor, she was informed that Defendant's mother withdrew him from Millsboro Middle School and enrolled him in online courses.

Between March 1, 2024 and June 10, 2024, Defendant was compliant with weekly probation contacts. He was also referred to the multi-systemic therapy (MST) family and community-based treatment program. The Defendant attended his sessions with his MST therapist. Defendant tested positive for marijuana in drug screens administered on April 11, 2024 and May 9, 2024.

On May 9, 2024, the Defendant was referred to the Vision Quest for Sanctuary Program for youth to recover from the effects of trauma and chronic stress. The initial intake was completed but was discontinued due to the Defendant's arrest for the current charges.

Officer Bryant testified that if adjudicated as a juvenile, YRS jurisdiction would last until age 19 and Defendant could be placed at Ferris until age 19. Further, if ordered by the Court, jurisdiction could extend to age 21 with community-based supervision. Officer Bryant further testified that if the Defendant was found guilty as an adult, the Defendant could be placed at Ferris School until age 18 and then transferred to the adult system. Officer Bryant lastly testified that it is the position of YRS the Defendant's charges remain in Superior Court for resolution after an analysis of the Section 1011 factors.

Dr. Benjamin Lungen, a psychologist with the Division of Prevention and Behavioral Health Services (DPBHS), testified he performed the CAS evaluation for the Defendant prior to his Family Court sentencing. Dr. Lungen noted that at the time the Defendant lived with his mother and older sister. He identified that Defendant had suffered from past traumatic events including witnessing a shooting in Pennsylvania, being stabbed in the back, witnessing his friend be the victim of a hit and run, and lastly, his grandfather's passing. Dr. Lungen testified he diagnosed Defendant with Conduct Disorder and opined that Defendant could benefit from Vision Quest services with cognitive behavioral counseling as part of his juvenile probation. On cross examination Dr. Lungen testified that he did not review Defendant's school records while performing the CAS evaluation.

Rebecca Hagan, Millsboro Middle School Assistant Principal, testified that she was Defendant's sixth grade teacher. Ms. Hagan testified at one point a Division of Family Services (DFS) referral was made when Defendant stated he wished to drop out of school and become a drug dealer. The Defendant had an Individualized Education Plan (IEP) and she noted that he worked hard in class. She also testified that between 2022 and 2024 Defendant had forty behavioral incidents while at school including inappropriate behavior, possession of a stolen credit card, offensive touching and disruption of the education process for others.

Willy Evans, Department of Corrections (DOC) Facilitator, testified about the programming at DOC. Mr. Evans further testified that a person with an IEP will receive preferential treatment for education services while at DOC.

Dr. Laura Cooney-Koss, Licensed Clinical Psychologist, testified that Defendant's IQ testing in 2019 was average. In 2022, Defendant's intellectual functioning diminished to 77 which is below average. In 2024, intellectual function testing indicated a score of 58 which is well-below average. Dr. Cooney-Koss attributed this to the diagnosis of Attention Deficit/Hyperactivity Disorder (ADHD) which was not treated because Defendant's mother does not believe in medication for the Defendant. Dr. Cooney-Koss also diagnosed Defendant with Post Traumatic Stress Disorder, General Anxiety Disorder and also has features of bipolar. Lastly, there is potential for intellectual disability that requires further testing to determine.

Dr. Cooney-Koss testified that Defendant's treatment needs include medication for ADHD, counseling, need to be an appropriate environment to model behavior after others, continued family support, continued education support and activities to expend energy (i.e., sports).

Dr. Cooney-Koss opined that testing reveals a favorable prognosis for Defendant. She believes his risk dangerousness compared to other juvenile offenders is at the low end of the moderate range. She further believes that this will improve with maturity and mental health services. She further opined that it is positive that his criminal history is minimal. Dr. Cooney-Koss believes that since jurisdiction can be extended to age 21 this is sufficient to provide appropriate treatment to revise his thoughts and behaviors and therefore, the Family Court system would benefit him and society.

The Court must take note that Defendant's rapid entry into the criminal justice system starting at age of 13 is very troubling. Defendant's first involvement included allegations of being in possession of a stolen car while wearing a ski mask. Upon his apprehension he resisted arrest, again, wearing a ski mask and gloves in July. Defendant was then allegedly involved in breaking into his friend's house and stealing a backpack which later was found containing two guns. As a part of this investigation Defendant's Facebook Page revealed a picture of Defendant holding what appeared to be a stolen gun. Several weeks later, while still at the age of 13,

13

Defendant was involved in an armed carjacking where the Defendant and his co-defendant were armed with knives and both assaulted the victim. While on probation for several months for these incidents, the Defendant was removed from school and made his probation appointments. While on probation the Defendant did test positive for marijuana on two occasions. The Defendant was only on juvenile probation several months before this incident occurred. Again, this incident involves Defendant shooting multiple times into a crowd killing one person and striking another. The Court must weigh the second factor against transferring the charges.

### 3. *Section 1011(b) Factor Three: Interest of Society and Defendant*

As noted above, although the rehabilitative efforts and services were short-lived, they were not successful. Defendant's violent behavior has escalated in a short period of time despite efforts from YRS and the Family Court. Probation obviously did not work and it does not escape the Court of the limitations of the juvenile justice system. YRS will only provide services until the age of 19. While there is a possibility of extended jurisdiction to 21 the supervision between ages 19 and 21 would only include community supervision. Therefore, the Court must find that this factor also weighs against transfer of the charges to Family Court.

14

## Conclusion

The Court finds that the State has established, and the Defendant concedes, that there is a fair *prima facie* likelihood of conviction at trial. After weighing the factors set forth in 10 *Del. C.* § 1011(b), transfer is not appropriate. Therefore, Defendant's Motion to Transfer Charges to Family Court is **DENIED**.

**IT IS SO ORDERED.**

/s/ Mark H. Conner
_____
Mark H. Conner, Judge

xc: Prothonotary

15